IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PHILIP R. SHAWE and SHIRLEY SHAWE, | § § § | No. 423, 2016 |
| | § § § § | |
| Respondents Below-Appellants, | § § | |
| | § | Court Below—Court of Chancery |
| v. | § § | of the State of Delaware |
| | § | C.A. Nos. 9686, 9700, and 10449 |
| ELIZABETH ELTING, | § § | |
| | § | |
| Petitioner Below-Appellee. | § § | |

Submitted: January 18, 2017
Decided: February 13, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon Appeal from the Court of Chancery of the State of Delaware: **AFFIRMED**.

Lisa A. Schmidt, Esquire, Robert L. Burns, Esquire and Nicholas R. Rodriguez, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware; Philip L. Graham, Jr., Esquire, John L. Hardiman, Esquire and Penny Shane, Esquire, Sullivan & Cromwell LLP, New York, New York; Howard J. Kaplan, Esquire and Joseph A. Matteo, Esquire, Kaplan Rice LLP, New York, New York and David B. Goldstein, Esquire (*argued*), Rabinowitz, Boudin, Standard, Krinsky & Lieberman P.C., New York, New York for Respondent Below, Appellant Philip R. Shawe.

Jeremy D. Eicher, Esquire,Thomas A. Uebler, Esquire and Mark M. Dalle Pazze, Esquire, Cooch and Taylor, P.A., Wilmington, Delaware; Alan M. Dershowitz, Esquire (*argued*), Cambridge, Massachusetts; Adam K. Grant, Esquire, Polsinelli PC, New York, New York, for Respondent Below, Appellant Shirley Shawe.

Kevin R. Shannon, Esquire, Berton W. Ashman, Jr., Esquire, Christopher N. Kelly, Esquire, Jaclyn C. Levy, Esquire and Mathew A. Golden, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Philip S. Kaufman, Esquire (*argued*), Ronald S. Greenberg, Esquire, Jeffrey S. Trachtman, Esquire, Marjorie E. Sheldon, Esquire and Jared I. Heller, Esquire, Kramer Levin Naftalis & Frankel LLP, New York, New York; Eric Alan Stone, Esquire, Robert A. Atkins, Esquire and Gerard E. Harper, Esquire, Paul, Weiss, Rifkand, Wharton & Garrison LLP, New York, New York, for Petitioner Below, Appellee Elizabeth Elting.

**SEITZ**, Justice, for the Majority:

Philip Shawe and his mother, Shirley Shawe, have filed an interlocutory appeal from the Court of Chancery's August 13, 2015 opinion and July 18, 2016 order, and related orders, appointing a custodian under 8 *Del. C.* § 226 to sell TransPerfect Global, Inc., a Delaware corporation. After a six-day trial filled with unprecedented evidence of a lengthy and seriously dysfunctional relationship between the owners, culminating in Philip Shawe's litigation misconduct, the Court of Chancery issued a 104-page opinion concluding that the warring factions were hopelessly deadlocked as stockholders and directors. The court carefully considered three alternatives to address the dysfunction and deadlock, and in the end decided that the circumstances of the case required the appointment of a custodian to sell the company.

On appeal, the Shawes do not challenge the Court of Chancery's many factual findings of serious dysfunction and deadlock. Instead, Philip Shawe claims for the first time on appeal that the court exceeded its statutory authority when it ordered the custodian to sell a solvent company. Alternatively, Shawe contends that less drastic measures were available to address the deadlock. Shirley Shawe has taken a different tack, and argues for the first time on appeal that the custodian's sale of the company might result in an unconstitutional taking of her one share of TransPerfect Global stock.

We disagree with the Shawes and affirm the Court of Chancery's judgment. First, under the custodian statute, the Court of Chancery may appoint a custodian when the stockholders are unable to elect directors whose terms have expired. Here, the parties stipulated that they were unable to do so. Further, a custodian may be appointed when the corporation's business is suffering from, or is threatened with, irreparable injury because of divisions between the directors, and the stockholders are unable to terminate the division. Here, the director and stockholder deadlock are undisputed, and the Court of Chancery made detailed factual findings of threatened and actual irreparable harm to the company which we will not disturb on appeal. We also agree with the Court of Chancery's conclusion that, in circumstances such as this, when intermediate measures were attempted but failed, the Court of Chancery properly exercised its discretion to sell the company and distribute the proceeds to deadlocked stockholders.

Finally, Philip and Shirley Shawe have attempted to raise statutory and constitutional arguments that were not considered by the Court of Chancery. Under this Court's long-standing rules and the important policy reasons guiding them, we do not consider arguments raised by the Shawes for the first time on appeal. Our dissenting colleague has concluded, however, that even though the statutory argument was never considered by the Court of Chancery, it should be

2

addressed for the first time on appeal. Thus, in response to the dissent, we explain why we disagree with its interpretation of the custodian statute.

## I.

TransPerfect Global, Inc. ("TPG") is a Delaware corporation that acts as a holding company for the main operating company, TransPerfect Translations International, Inc. ("TPI"), a New York corporation. Both entities will be referred to as the "Company." The Company provides translation, website localization, and litigation support services from 92 offices in 86 worldwide cities. It has over 3,500 full-time employees and maintains a network of over 10,000 translators, editors, and proofreaders in about 170 different languages. Elting and Shawe co-founded the Company and are co-chief executive officers and board members.

TPG has 100 shares of common stock issued and outstanding, divided fifty shares to Elting, forty-nine shares to Shawe, and one share to Shirley Shawe. In this Opinion, we refer to Philip Shawe as "Shawe," and Shirley Shawe by her full name. The one share allocated to Shirley Shawe allowed TPG to claim the benefits of being a majority women-owned business. We credit the Court of Chancery's finding, based on evidence introduced at trial, that Shawe "has treated his mother's

share as his own property and himself as a 50% co-owner of the Company."[1] After a corporate reorganization in 2007, TPG's bylaws provided for a three member board of directors, or a different number fixed by the stockholders. Elting and Shawe have been the only directors since the Company's reorganization in 2007.

To fully appreciate the personal nature of the long-running discord leading to the Court of Chancery's ruling, we go back to the Company's founding and the troubled romantic relationship between the founders. Elting and Shawe co-founded the business in 1992 while living together in a dormitory room attending New York University's business school. They were engaged in 1996, but Elting called the marriage off in 1997. As the Court of Chancery found, "Shawe did not take the break-up well, and would 'terrorize' her and say 'horrendous things' about her husband, Michael Burlant, whom she married in 1999."[2] On two separate occasions, Shawe responded to the rejection by crawling under Elting's bed and refusing to leave.[3]

---

[1] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *2 (Del. Ch. Aug. 13, 2015). Elting demonstrated at trial that Shawe held a general proxy for Mrs. Shawe's one share, and consistently held himself out as the 50% owner of TPG. *Id*.

[2] *Id*. at *3.

[3] When Elting ended their engagement, Shawe refused to leave the apartment and crawled under her bed and stayed there for at least half an hour. App. to Opening Br. at 2393 (Trial Tr.). On another occasion, Elting was traveling alone in Buenos Aires looking for space to open a new office. She arrived at her hotel room to find that Shawe had showed up unannounced. When she asked him to leave, he crawled under her hotel bed and stayed there for about half an hour. *Id*.

4

As the Company grew, the founders were not satisfied with their financial success, and brought their simmering personal discontent into the Company's business affairs. The Court of Chancery catalogued the serious clashes over the years between Shawe and Elting and their surrogates before, and remarkably, during the litigation:

• Shawe engaged in a secret campaign to spy on Elting and invade her privacy by intercepting her mail, monitoring her phone calls, accessing her emails (including thousands of privileged communications with her counsel), and entering her locked office without permission on numerous occasions as well as sending his so-called "paralegal" there at 4:47 a.m. on another occasion.

• Shawe co-opted the services of Company advisors (*e.g.,* Gerber and Kasowitz) to assist him in advancing his personal agenda against Elting.

• Shawe unilaterally hired numerous employees to perform Shared Services functions (Accounting and Finance) and even to work in divisions Elting managed (Chris Patten in TRI) without her knowledge or consent by creating "off book" arrangements and fabricating documents.

• Shawe sought to have Elting criminally prosecuted by referring to her as his ex-fiancée seventeen years after the fact when filing a "Domestic Incident Report" as a result of a seemingly minor altercation in her office.

• Shawe disparaged Elting and tried to marginalize her within the Company by gratuitously disseminating a memorandum (on Gerber's letterhead) to employees in her own division accusing her of collusion and financial improprieties.

5

• Shawe disparaged Elting publicly by unilaterally issuing a press release in the Company's name containing false and misleading statements.[4]

These were just some of the highlights of the facts found by the Court of Chancery after a lengthy trial. The court also made detailed findings about continuous acrimonious disputes over personal and business expenses, weekly if not daily temper tantrums, and "mutual hostaging" between the founders over proposed acquisitions, stockholder distributions, employee hiring, pay and bonuses, and office locations. The court also found that Shawe bullied Elting and those aligned with her, expressing his desire to "create constant pain" for Elting until she agreed with Shawe's plans.[5] It was common for senior officers to be drawn into their disputes, who were then abused by threatened firings, substantial fines, inappropriate emails, and by withholding compensation and promotions.

Specific to the Company's operations, the Court of Chancery heard days of testimony leading to findings that:

• Elting refused to pay litigation counsel to defend significant ongoing patent infringement litigation.

• Shawe fired real estate professionals, public relations professionals, refused to execute leases, and interfered with the Company's payroll processes.

---

[4] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *27 (internal citations omitted).
[5] *Id*. at *6.

6

• Shawe refused to engage in an annual expense true up, and interfered with the annual review of the Company's financials and its audit process.

• Shawe falsified corporate records to avoid review by Elting.

The Court of Chancery best captured the lengths that Shawe would go to harass Elting in its recounting of Elting's plane trip to Paris in 2014:

> On December 2, 2014, Elting boarded a red eye flight to Paris and discovered, to her surprise, that Shawe was seated across the aisle from her. Shawe claimed to have "no idea" she would be on the flight. In truth, Shawe previously learned that Elting would be on the flight and made arrangements to be seated next to her without her knowledge. Elting changed seats. The next day, Shawe sent a text message to several of his allies, stating: "Was next to Liz on the plane to Paris and she switched seats ;)." Two of the recipients of the text message were Nathan Richards and Joe Campbell, both of whom are implicated in events concerning Shawe's alleged spoliation of evidence, which is the subject of a motion for sanctions discussed below.
>
> I find Shawe's characterization of the incident as an attempt to extend an olive branch not to be credible. He did not deny telling Elting that he had "no idea" she would be on the flight, which was not true, and the smiley-face emoticon at the end of his text message suggests he was amused by yet another opportunity to harass Elting, who Shawe knew full well would not welcome his presence on the flight.[6]

## II.

While Shawe and Elting continued to harass each other, interfere with the business, and demoralize the employees, they filed four lawsuits against each

---

[6] *Id*. at *23 (internal citations omitted).

7

other.[7]  The conflict eventually distilled down to Elting's petition under 8 *Del. C.* § 226 to declare a deadlock and appoint a custodian to sell TPG.

The court dedicated enormous resources to the dispute.  It held twelve hearings, decided sixteen motions, and conducted a six-day trial.  Before its final decision, the Court of Chancery took the measured step of appointing a custodian to serve as a mediator to assist Shawe and Elting to try and settle their disputes. The court also delayed its post-trial decision for two months to await the parties' ongoing efforts to resolve the controversy.  After the many attempts at settlement failed, the Court of Chancery issued its 104-page decision finding that "the evidence presented at trial warrants the appointment of a custodian to sell the Company to resolve the deadlocks between Shawe and Elting."[8]

First, the Court of Chancery found that Elting had satisfied the requirements of § 226(a)(1) to appoint a custodian for stockholder deadlock because the parties stipulated that they were divided and unable to elect successor directors.  Next, the court held that Elting satisfied the three requirements of § 226(a)(2) for

---

[7] On May 8, 2014, Elting filed an action in New York seeking to remove Shawe as a TPI director.  On May 15, 2014, she filed a verified petition for dissolution of Shawe & Elting LLC (Shawe and Elting's joint owned asset protection and distribution vehicle) in the Court of Chancery.  On May 22, 2014, Shawe filed a verified complaint in the Court of Chancery individually and derivatively on behalf of TPG asserting claims against Elting for waste, breach of fiduciary duty, unjust enrichment, breach of contract, and indemnification.  On May 23, 2014, Elting filed a petition in the Court of Chancery seeking the appointment of a custodian to sell the Company, and dissolution of TPG under the court's equitable powers.  *Id*. at *18.
[8] *Id*.

8

appointment of a custodian due to director deadlock. As to the first requirement, the existence of deadlocks, the court reviewed in painstaking detail its many factual findings, now undisputed on appeal, supporting its conclusion that the distrust Shawe and Elting have for each other "strikes at the heart of the palpable dysfunction that exists in the governance of the Company."[9] The Court of Chancery also held that the second requirement, the stockholders' inability to break the director deadlock, was satisfied by the parties' stipulation of deadlock.

Turning to the final requirement, harm to the business, the Court of Chancery considered the profitability of the Company, but also made the commonsense observation that the statute contemplates appointment of custodians for profitable corporations which, like distressed companies, can suffer or be threatened with irreparable injury. The court then catalogued some of the many examples of actual and threatened irreparable injury to the Company:

- Kevin Obarski (Senior Vice President of Sales) called the feud the "biggest business issue" the Company faces, and bemoaned that the "crazy arbitrary stuff" coming out of it was "the number 1 reason people leave to go to work at competitors."

- Michael Sank (Vice President of Corporate Development) agreed: "it's so obviously the biggest problem the company faces."

- Yu-Kai Ng (Chief Information Officer) identified as a Company goal in the wake of the 2013 Avengers meeting the need to find a way

---

[9] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *27.

9

for Shawe and Elting to work together "without negatively impacting everyone else."

• Mark Hagerty (Chief Technology Officer) testified that the conflict "hurts company morale" and "is detrimental to the company."

• Robert DeNoia (former Vice President of Human Resources) expressed his frustration with the "pervasive and continuous hostile environment where inappropriate behavior impacts the morale, health and well-being of myself and the staff."

• Roy Trujillo (Chief Operating Officer), in a letter drafted for submission to a special master appointed in the New York action, attributed the "mass exodus" in Accounting and Finance to "the ongoing disputes and stressful environment created by it." He further stated that "[e]mployees are resigning and leaving these departments at unprecedented rates," that "[t]he morale and retention issue will likely spread," and that "[t]he company's reputation is taking a beating, internally and externally."

• Kai Chu (an Accounting employee), attributed the "plummeting" morale and loss of employees in Accounting to the "diametrically opposed" orders that had been received from Shawe and Elting.

• Fiona Asmah (a Finance employee) testified that the disputes and conflicting directives have caused her and others to feel "caught in the middle," have created an "unhealthy work environment," and have "affected employee morale."[10]

Shawe himself acknowledged "the potential for grievously harming" the Company by his continued feuding with Elting.[11] The Court of Chancery also found that major clients who are free to use competitive services have expressed concerns about the dispute. Shawe and Elting have also been unable to agree on

---

[10] *Id.* at *29 (internal citations omitted).
[11] *Id.* at *15 (internal citation omitted).

10

acquisitions which generally accounted for between 16.5-20% of the Company's annual revenue and 8-14% of its annual net profit. The Company has made no acquisitions since 2013. As the Court of Chancery held:

> [A]lthough it is true that the Company is and has been a profitable enterprise to date, its governance structure is irretrievably dysfunctional. The Company already has suffered from this dysfunction and, in my view, is threatened with much more grievous harm to its long-term prospects if the dysfunction is not addressed.[12]

When it came to the scope of the custodian's authority, the Court of Chancery considered three alternatives. First, the court could do nothing and "leave the parties to their own devices."[13] The court rejected this option because the "management of the Company is one of complete and utter dysfunction that is causing the business to suffer and threatens it with irreparable harm notwithstanding its profitability to date."[14] The Chancellor "found Elting's distrust of Shawe to be justified" and "Shawe's actions have cast a pall on the prospect that a third party would pay a fair price for her shares."[15] The court thus decided against the "do nothing" option because "equity will not suffer a wrong without a remedy."[16]

---

[12] *Id.* at *30.
[13] *Id.* at *31.
[14] *Id.*
[15] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *31.
[16] *Id.* (quoting *Weinberger v. UOP, Inc.*, 1985 WL 11546, at *9 (Del. Ch. Jan. 30, 1985), *aff'd*, 497 A.2d 792, 1985 WL 188543 (Del. 1985) (TABLE)).

Second, the court considered whether to appoint a custodian to serve as a third director or act in some capacity to break the ties between the two factions. He rejected this option because:

> [I]t would enmesh an outsider and, by extension, the Court into matters of internal corporate governance for an extensive period of time. Shawe and Elting are both relatively young. Absent a separation, their tenure as directors and co-CEO's of the Company could continue for decades. It is not sensible for the Court to exercise essentially perpetual oversight over the internal affairs of the Company.[17]

This left the Court of Chancery with a final option—"appoint a custodian to sell the Company so that Shawe and Elting can be separated and the enterprise can be protected from their dysfunctional relationship."[18] The court recognized that the remedy was "unusual," and "should be implemented only as a last resort and with extreme caution."[19] But after reviewing the statute and case law, the court determined that the Court of Chancery "has appointed custodians to resolve deadlocks involving profitable corporations and authorized them to conduct a sale of the corporation."[20] Further, the Chancellor held:

> Having conducted a six-day trial, decided at least sixteen motions, held numerous lengthy hearings, and considered carefully the documentary evidence and credibility of the witnesses along with the parties' extensive submissions, the painfully obvious conclusion is

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* (citing *Bentas v. Haseotes*, 769 A.2d 70, 73 n. 3 (Del. Ch. 2000) and *Fulk v. Wash. Serv. Assocs., Inc.*, 2002 WL 1402273, *2 (Del. Ch. June 21, 2002)).

12

that Shawe and Elting need to be separated from each other in the management of the Company for its own good. Their dysfunction must be excised to safeguard the Company.[21]

## III.

Shawe's primary argument on appeal is that the court exceeded its statutory authority when it ordered the custodian to sell a solvent company. Alternatively, Shawe argues that, even if the statutory authority existed to authorize the custodian to sell the Company, the Court of Chancery should have tried other measures to address the deadlock before resorting to a sale of the Company. We find, however, that Shawe failed to raise his statutory argument in the Court of Chancery, and cannot raise it for the first time on appeal. We also find that the Court of Chancery took a measured approach to the dispute, and only ordered the custodian to sell the Company after attempting less intrusive measures, and reasonably concluding other less intrusive measures would not be effective. The court's decision to appoint a custodian to sell the Company was supported by the facts found after trial, was permitted by the statute, and thus was not an abuse of discretion.[22]

## A.

The statute, 8 *Del. C*. § 226(a), provides that "[t]he Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians,

---

[21] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *31.
[22] *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 240 (Del. 1982) (applying abuse of discretion standard).

13

and, if the corporation is insolvent, to be receivers, of and for any corporation []."

As this prefatory language contemplates, custodians are appointed for solvent

corporations, and receivers are appointed for insolvent corporations.

There are three pathways to appoint a custodian for a solvent corporation,

two of which are relevant to this case. First, a custodian may be appointed when:

> (1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors . . . .[23]

Or, a custodian may also be appointed when:

> (2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division . . . .[24]

Shawe does not contest the Court of Chancery's ruling that a custodian may

be appointed under § 226(a)(1) due to the stockholder deadlock between Shawe

and Elting, and their inability to elect successor directors. Nor could he. Shawe

and Elting stipulated to the stockholder deadlock required by the statute.[25]

Shawe does challenge the Court of Chancery's appointment of a custodian

under § 226(a)(2), claiming that the court misapplied the requirement that the court

---

[23] 8 *Del. C.* § 226(a)(1).
[24] *Id.* § 226(a)(2).
[25] App. to Opening Br. at 3181-85 (Stipulation and Order).

find irreparable injury to the business of the corporation. According to Shawe, the court improperly relied on case law defining irreparable injury in the temporary injunction context, instead of applying a supposedly more rigorous "imminent corporate paralysis" standard under § 226. Shawe argues that applying the wrong standard "trivializes and undermines Section 226" because judicial intervention is only permitted in "extreme circumstances."[26]

First, the argument is academic because Shawe agreed that the Court of Chancery was authorized to appoint a custodian under § 226(a)(1). Elting need not show irreparable injury under the first part of the statute.[27] Further, the Court of Chancery did not misapply the threatened or actual irreparable injury requirement. As the court observed, "irreparable injury" is "a familiar equitable principle" which takes into account factors like "harm to a corporation's reputation, goodwill, customer relationships, and employee morale."[28] Whether describing the standard as the Chancellor did, or as imminent corporate paralysis, it is a distinction without a difference. This Court in *Giuricich v. Emtrol Corp.* used the same words interchangeably.[29] The Court of Chancery properly applied the words of the

---

[26] Shawe Opening Br. at 29.
[27] *Giuricich*, 449 A.2d at 238 (irreparable injury not required before appointing a custodian under § 226(a)(1)).
[28] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *28.
[29] 449 A.2d at 239 n.13 (describing "imminent corporate paralysis" as equivalent to "irreparable harm" when considering whether irreparable harm is required before appointment of custodian under § 226(a)(1)).

15

statute and settled principles of irreparable injury to evaluate the likelihood of threatened or actual irreparable injury to the Company's business.

Far from trivializing the irreparable injury requirement, the Court of Chancery accepted the fact that the Company was profitable, but also recognized the extremely dysfunctional relationship between the founders and its effect on all of the Company's operations. If allowed to persist, the Company was likely to continue on the path of plummeting employee morale, key employee departures, customer uncertainty, damage to the Company's public reputation and goodwill, and a fundamental inability to grow the Company through acquisitions.

We will not disturb these factual findings on appeal. The trial record amply supports the Court of Chancery's finding that the deadlock and dysfunction between the founders is causing threatened and actual irreparable injury to the Company.[30]

**B.**

Having decided that the Court of Chancery properly exercised its discretion under § 226 to appoint a custodian of the Company, we turn to Shawe's primary argument raised for the first time on appeal—that the custodian statute does not

---

[30] Shawe also raises an unclean hands defense, claiming that Elting's obstructionist conduct barred the appointment of a custodian. The argument was not fairly presented to the Court of Chancery, and will not be considered for the first time on appeal. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.").

16

authorize the court to order the custodian to sell the Company over the stockholders' objection. Shawe also argues that instructing the custodian to sell the Company is an extreme remedy, and should not have been imposed without first attempting less-drastic remedies, such as using the custodian as a third director to break the ongoing deadlocks between the founders.

For the important reasons expressed in Part IV of this Opinion, our Court requires that arguments be considered in the first instance by the trial court before appellate review.[31] We have closely scrutinized Shawe's record citations where he claims his statutory argument was raised below, and find each of his citations unconvincing or supporting the opposite conclusion.[32] The argument is waived.

---

[31] Supr. Ct. R. 8. To avoid Rule 8, the dissent concludes that Shawe's statutory argument was fairly encompassed within his general argument made below—that the Court of Chancery should not order a sale under Section 226. Dissent at 2, n.3. But Rule 8 is not satisfied by attempting to anchor serious appellate arguments in the shifting sands of general arguments made below. As the following footnote demonstrates, Shawe not only failed to raise the statutory argument in the Court of Chancery, he took positions inconsistent with the dissent's interpretation of § 226. The Court of Chancery addressed a myriad of issues raised by eleven law firms, including Shawe's litigation misconduct. The statutory interpretation argument was not one of them. The statutory interpretation argument "credibly can be avoided" because it was never presented to the Court of Chancery, and the Shawes took positions in the Court of Chancery contrary to those offered by the dissent for the first time on appeal. *See* Dissent at 2, n.3.

[32] App. to Opening Br. at 3786-91 (Shawe Post-Trial Brief) (Court of Chancery should not appoint a custodian to sell the business because the statute "*discourages* dissolution" and "Delaware courts refuse to exercise their discretion to dissolve solvent companies where other measures 'milder' than dissolution are available.") (emphasis in original); *id*. at 3836 (Shawe Answering Post-Trial Brief) ("Elting has not met the very high standard for appointment of a custodian to dissolve and sell the Company under Section 226" and "Dissolution is a last, not first resort."); *id*. at 3850 (Shawe Answering Post-Trial Brief) ("There is no precedent for ordering dissolution because of one failed election of directors."); *id*. at 3852-57 (Shawe Answering Post-Trial Brief) (attempting to distinguish case law but no mention of custodian's lack of authority to sell the Company under § 226(b)); *id*. at 2382-83 (Shawe Answering Post-

17

Even if the argument was properly before us, we find that the arguments relied upon by the dissent for the first time on appeal lack merit.[33]

Section 226(b) of the statute provides that:

A custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the custodian is to continue the business of the corporation, and not to liquidate its affairs and distribute its assets, except when the Court shall otherwise order, and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title.[34]

Section 394 of the Delaware General Corporation Law ("DGCL") provides that all corporations agree to make all provisions of the DGCL part of their charters. Under the express language of the custodian statute, the Court of Chancery has the authority to "otherwise order" the custodian to "liquidate [the Company's] affairs and distribute its assets" rather than "continue the business of the corporation."[35] In other words, the custodian's default duty is to continue the

---

Trial Brief) (no argument made that § 226(b) precludes sale of the Company—only arguing that "Elting has provided no grounds" to dissolve the Company); *id.* at 3916-23 (Post-Trial Oral Argument) (arguing that the custodian's authority should be "sharply limited" and "rarely, if ever," appropriate under § 226 but no argument that the statute does not permit a sale, and describing sale as the "ultimate remedy"); *id.* at 4114-16 (Shawe's Objections to Sale Report) (Shawe Answering Post-Trial Brief) (challenging custodian's sale authority under an improper delegation argument, but not under § 226(b)).

[33] The dissent chides the majority for responding to the waived statutory interpretation arguments. The dissent has, however, undertaken an exhaustive analysis of § 226, an analysis that we believe is mistaken. Thus, we are obliged to point out why the waived argument has no merit.

[34] 8 *Del. C.* § 226(b).

[35] *Id.*

18

business of the corporation, but the Court of Chancery can displace the default duty by ordering that the company's affairs be liquidated.

Several sources confirm the Court of Chancery's broad authority under the statute, which includes ordering a sale. As the court noted, the Court of Chancery has previously authorized a custodian to sell a company when faced with stockholder deadlock.[36] This Court has also recognized the broad authority granted the Court of Chancery under the statute. Section 226(b) provides that the custodian shall have "all the powers and title of a receiver appointed under § 291."[37] Although we have cautioned that normally the custodian's authority "should be kept to a minimum" and "should be exercised only insofar as the goals of fairness and justice . . . require," we have also observed that the court's broad

---

[36] See Bentas, 769 A.2d at 73 n. 3 (ordering appointment of a custodian to resolve deadlock for a "solvent and profitable corporation"). The court authorized the custodian to auction the company in a later decision. Bentas v. Haseotes, 2003 WL 1711856 (Del. Ch. Mar. 31, 2003). See also Fulk, 2002 WL 1402273, at *2, 10 (Court appointed a custodian to sell a corporation that had "consistently been profitable," and found that "nowhere does the statute require that a sale under Section 273 must take the form of a piecemeal sale of the corporation's assets. Although Section 273 permits such a sale, its language is equally consistent with a court-ordered sale of the entire business to a third party as a going concern."); In re Supreme Oil Co., Inc., 2015 WL 2455952 (Del. Ch. May 22, 2015) (ordering custodian to sell profitable company); Brown v. Rosenberg, 1981 WL 7638, at *5 (Del. Ch. Dec. 17, 1981) (Recognizing "that it is more likely than unlikely that a [c]ourt will end up appointing a receiver to liquidate a corporation where there are but two stockholders, both of whom own 50% of the corporation's shares, when they are unable to agree on anything."). Although these examples involve actions where the parties eventually agreed the business should be liquidated or sold, they demonstrate the Court of Chancery's exercise of its broad discretion to fashion an appropriate remedy to resolve a deadlock.
[37] 8 Del. C. § 226(b).

19

authority to set a receiver's duties under § 291 leads to the same conclusion for a custodian's authority under § 226(b):

> We interpret this section [226(b)] as setting forth the maximum statutory limits on the powers of the custodian. Section 291, to which § 226(b) specifically refers, states: "the powers of the [receiver] shall be such and shall continue so long as the Court shall deem necessary." Thus, under §§ 226 and 291, the Court of Chancery may determine the duration of the appointment and the specific powers to be conferred upon the custodian.[38]

The dissent does not take issue with the express language of the statute that the custodian has all of the powers of a receiver under § 291. Nonetheless, it appears to argue that a custodian is not empowered to exercise the powers of a receiver when the court "otherwise orders" that a deadlocked solvent company be sold.[39] According to the dissent, even though the language "except as the Court shall otherwise order" directly modifies the phrase coming before it—"not to liquidate its affairs and distribute its assets"—and is followed by the words "and except"—the dissent argues that interpretive principles should be applied to require that the exception language be read to permit liquidation only in circumstances similar to § 226(a)(3) (corporations that have abandoned their business) and § 352(a)(3) (custodians for close corporations).

---

[38] *Giuricich*, 449 A.2d at 240.
[39] Dissent at 6-7, n.12; 23, n.63.

20

The problems with this interpretation of the statute are apparent. The dissent attempts to change the plain meaning of the statutory language by invoking rules of statutory interpretation. But if a statute is clear and unambiguous, "the plain meaning of the statutory language controls."[40] This is because "[a]n unambiguous statute precludes the need for judicial interpretation."[41]

Under a plain reading of § 226(b), the custodian has the powers of a receiver under § 291, and his duties are to continue the business unless the Court otherwise orders, and except under the special circumstances of abandoned businesses and close corporations. Rules of interpretation should not be invoked to contort the plain language of a statute in a manner inconsistent with its plain meaning.

Further, the dissent's interpretation also ignores the conjunctive words "and except." The statute cannot reasonably be read to express the three exceptions as a series of similar events. Instead, when the words "and except" are given meaning, the statute is reasonably read to list three distinct exceptions to the custodian's default duty to maintain the business—"except when the Court shall otherwise order;" and "except in cases arising under paragraph (a)(3) of this section;" or "§ 352(a)(2) of this title."[42]

---

[40] *LeVan v. Independence Mall, Inc.*, 940 A.2d 929, 932-33 (Del. 2007) (quoting *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999)).
[41] *Id.*
[42] 8 *Del. C.* § 226(b).

21

The dissent also points to § 273, a section of the DGCL permitting dissolution of joint venture corporations when two 50% owner-stockholders are deadlocked. In many instances, that statute has been employed to break a deadlock through a sale of the corporation under the auspices of the Court of Chancery and a fiduciary appointed by it for that purpose.[43] Contrary to what the dissent contends, it is by no means unprecedented for the Court of Chancery to have to address the fate of a solvent Delaware corporation by setting up a fair process to have it sold as a going concern, when that outcome is necessary to best protect its constituencies.

As the Chancellor observed, this case "was within a whisker" of § 273.[44] The only novelty here is that this case arises under § 226, because the economic and functional reality of the deadlock does not fall precisely under § 273. But, consistent with the flexible and efficient design of the DGCL, § 226 allows the Court of Chancery to address this situation by using its power to deal with cases on a situational basis. Rather than read the key language "except when the Court shall otherwise order" as having no significance, we read it consistently with the overall

---

[43] *See, e.g.*, *Fulk*, 2002 WL 1402273, at *2, 10; *Matter of Bermor, Inc.*, 2015 WL 554861, at *5 (Del. Ch. Feb. 9, 2015) (appointing receiver); *In re Bermor, Inc.*, 2015 WL 7856593 (Del .Ch. Dec. 2, 2015) (ORDER) (order approving receiver's plan of sale); *see also Kortum v. Webasto Sunroofs Inc.*, 769 A.2d 113 (Del. Ch. Feb. 9, 2000) (noting that "if the Section 273 action proceeds to a conclusion, it is possible that . . . all of [the company's] outstanding shares will be sold at a public auction.").

[44] App. to Opening Br. at 2911 (Trial Tr.) ("It's interesting, this case is within a whisker of a 273 case where that would not be a very unremarkable request to make. And obviously, the Court has enormous equitable discretion, but it's practical.").

22

design of the statute, and its intention to allow our Court of Chancery the discretion to deal sensibly with corporations that are unable to move forward with governance because their owners cannot take fundamental action to elect a new board. That the Chancellor looked for guidance to the remedies entered in cases under § 273 was not error on his part. Instead, it suggests that the court understood TPG's economic reality as identical to a 50-50 deadlock, and that the tools used to sensibly address those deadlocks would inform his discretion under § 226.

It is also not convincing to characterize the method chosen by the Chancellor as somehow different for purposes of § 226 because it involves a sale of the corporation's stock, rather than its underlying assets. Stockholders of Delaware corporations are only entitled to the rights that come with their stock, and those rights are subject to the Court of Chancery's power under statutes like § 226.[45] Many Delaware statutes, including those dealing with certain mergers, subject stockholders to giving up their shares over their objection.

When a stockholder buys stock in a Delaware corporation, it knows that our statute provides the Court of Chancery broad authority to address corporate deadlocks of various kinds, authority that may well affect fundamental ownership interests. Stockholders buy stock in Delaware corporations to gain from the underlying operations of the corporation. It is therefore inconsistent with the

---

[45] 8 *Del. C.* § 394.

23

practical and efficient design of corporate law in the DGCL, to require asset sales

and liquidations, simply to allow stockholders to hold their paper shares and

receive a final, and likely lower, liquidating dividend. Nor is it the case that sales

of corporate assets or of the entire corporation are somehow unusual when the

corporation in managerial deadlock is profitable. The reality is that most of the

cases in which the Court of Chancery has ordered a sale or its equivalent in the

context of § 273 dealt with profitable corporations.[46] Those are the corporations

that parties tend to fight over, especially in the Court of Chancery, because most

insolvent corporation cases are handled by federal bankruptcy courts. Parties

intractably deadlocked will rarely want what the dissent characterizes as a lesser

remedy like asset sales and dissolution.

This case illustrates that reality well. Here, making a distinction between

liquidation and sale has no real practical effect. TPG acts as a holding company

for the main wholly-owned operating company, TPI, and other subsidiaries. If we

accepted Shawe's interpretation of § 226(b), after remand the Court of Chancery

---

[46] The dissent points out that in the cases relied on by Elting, the stockholders did not object to the corporation's sale. *See, e.g.*, *In re Supreme Oil Co.*, 2015 WL 2455952 (Del. Ch. May 22, 2015 (ORDER); *EB Trust v. Info. Mgmt. Servs., Inc.*, No. 9443 (Del. Ch. June 17, 2014) (ORDER); *Fulk*, 2002 WL 1402273 (Del. Ch. June 21, 2002); *Bentas*, 1999 WL 1022112 (Del. Ch. Nov. 5, 1999). But the absence of cases where stockholders object to a company sale is not surprising, when the alternative remedy within the Court of Chancery's discretion is a liquidation of the corporation's assets. As noted above, it would be the rare case when the shareholders would engage in self-defeating behavior by giving up the value of a successful business's goodwill and other intangible assets in favor of a liquidation of its physical assets.

24

could exalt form over substance and order TPG's assets—TPI and other subsidiary companies—liquidated through a sale process, and the proceeds distributed to TPG and then its stockholders. Shawe concedes as much.[47] Such meaningless corporate shuffling illustrates why a reasonable reading of the statute includes a custodian's authority to sell TPG instead of its parts. Neither Elting nor Shawe want an asset sale, and for good reason. Selling TPG as a going concern will protect TPG's employees from the ruinous consequences of an asset sale and provide the maximum return to the stockholders.[48]

Shawe also faults the Court of Chancery for ordering a sale instead of experimenting with less-intrusive measures. We agree with Shawe that a sale is a remedy to be employed reluctantly and cautiously, after a consideration of other options. The Court of Chancery should always consider less drastic alternatives before authorizing the custodian to sell a solvent company. But the remedy to address the deadlock is ultimately within the Court of Chancery's discretion.[49] The court did not abuse its discretion in this case.

---

[47] Shawe Opening Br. at 18-19 ("Section 226(b) . . . provides for continuation of the business or liquidation or distribution of the corporation's assets . . . ." (emphasis omitted)); *see also* App. to Opening Br. at 3786-91 (Shawe Pre-Trial Brief) (arguing that, under the facts of this case, the Court "should not dissolve the Company pursuant to its equitable powers.").

[48] The dissent has no substantive response to the reality set forth above, except to claim that the point was not conceded by the Shawes and "[n]o party during this appeal has even suggested that either a liquidation or a sale of assets is an option." Dissent at 6-7, n.12.

[49] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002) ("This Court reviews the Court of Chancery's fashioning of remedies for abuse of discretion.").

First, the court attempted other less intrusive measures by appointing a custodian immediately after trial ended to serve "as a mediator to assist Elting and Shawe in negotiating a resolution of their disputes."[50] Almost three months later, after the first attempt at mediation failed, the court gave the parties another month before issuing its post-trial opinion "to afford them additional time to seek to resolve their disputes through the auspices of the mediator."[51] The Court of Chancery was also aware of repeated efforts to resolve the dispute in New York, including settlement discussions, a mediation, and multiple sessions with a court-appointed Special Master. The Court of Chancery gave the parties every opportunity to resolve their acrimonious dispute outside the courthouse.

Further, the court considered whether to appoint a custodian "to serve as a third director or some form of tie-breaking mechanism in the governance of the Company."[52] But the court rejected this option because:

> [I]t would enmesh an outsider, and, by extension, the Court into matters of internal corporate governance for an extensive period of time. Shawe and Elting are both relatively young. Absent a separation, their tenure as directors and co-CEOs of the Company could continue for decades. It is not sensible for the Court to exercise essentially perpetual oversight over the internal affairs of the Company.[53]

---

[50] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *25.
[51] *Id.*
[52] *Id.* at *31.
[53] *Id.*

26

And, although Shawe characterizes the Chancellor's remedy as extremely intrusive, the appointment of a custodian to act as a constant monitor and tie-breaker—which is what would be required given the abundant record that Shawe and Elting cannot work together constructively—would itself be expensive, cumbersome, and very intrusive. Moreover, that approach would not facilitate, as the Chancellor's ruling does, the ability of the Company to capitalize on its business model in the efficient, flexible way that commerce demands. By preserving the Company as a whole in his remedy and allowing it to be owned and managed in the manner required to take advantage of evolving opportunities and to meet challenges effectively, the Chancellor's remedy also was well designed to protect the other constituencies of the Company—notably its employees—by positioning the company to succeed and thus to secure the jobs of its workforce.

The Chancellor was in the best position to assess the viability of options short of sale. Aware of the "extreme caution" that must be exercised before ordering a sale, he nonetheless determined that "the painfully obvious conclusion is that Shawe and Elting need to be separated from each other in the management

of the Company. Their dysfunction must be excised to safeguard the Company."[54]

We will not second-guess that first-hand judgment on appeal.[55]

**IV.**

For the first time on appeal, Shirley Shawe raises a novel argument that the Court of Chancery lacked the authority to order TPG's sale. Specifically, she alleges that the possibility that she would have to sell her share violates the Takings and Due Process Clauses of the United States and Delaware Constitutions. Shirley Shawe admits that she did not properly present this issue before the Court of Chancery.[56]

Under Supreme Court Rule 8, this Court only considers questions fairly presented to the trial court.[57] The rule provides a narrow exception "if [this Court] finds that the trial court committed plain error requiring review in the interests of

---

[54] *Id.*

[55] Shawe makes two other arguments on appeal, which we find without merit. First, Shawe claims that by ordering a sale, Elting will receive a "control premium" that she could only receive through a contract, such as a buy-sell agreement. The Court of Chancery correctly rejected this argument, reasoning that "the provisions of the Delaware General Corporation Law, including those afforded under section 226, apply by default," and thus the existence of a control premium shared by all the stockholders is irrelevant to the analysis. *Id.* at *32. Shawe also claims that the court's privilege rulings were erroneous. We need not evaluate the Court of Chancery's privilege rulings to find that the court properly considered as part of its analysis how Shawe obtained the documents without Elting's consent. Shawe instructed a surrogate to break into Elting's office and copy documents from her computer. Privileged or not, Shawe's conduct was reprehensible and confirmed the court's conclusion that a custodian was necessary to sell the Company instead of some measure short of a sale, doomed to fail.

[56] Shirley Shawe Opening Br. at 4.

[57] Supr. Ct. R. 8.

28

justice."[58]  This standard has been applied in both criminal and civil cases.[59]  We have previously refused to review constitutional arguments raised for the first time on appeal.[60]

"When reviewing for plain error, 'the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.'"[61]  "Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a

[58] *Smith v. Del. State Univ.*, 47 A.3d 472, 479 (Del. 2012).  This Court has previously used a different standard, which Shirley Shawe characterizes as a three part test: (1) "whether the issue is outcome-determinative and may have significant implications for future cases"; (2) whether the Court's "consideration of the issue will promote judicial economy because it will avoid the necessity of reconsidering the [issue]," (*e.g.*, *Sandt v. Del. Solid Waste Auth.*, 640 A.2d 1030, 1034 (Del. 1994)); and (3) when a question of public policy is involved relating to constitutional guarantees, *Rickards v. State*, 77 A.2d 199, 202 (Del. 1950).  That standard is much less frequently used, especially in our more recent cases, and Shirley Shawe cannot explain why we should prefer it to the more typically applied plain error standard.

[59] *Smith*, 47 A.3d at 479 (applying plain error standard in civil case); *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1255 (Del. 2011) (same); *Estate of Swan v. Balan*, 956 A.2d 1222, 1227 (Del. 2008) (same); *Beebe Med. Ctr., Inc. v. Bailey*, 913 A.2d 543, 555 (Del. 2006) (same); *Lagola v. Thomas*, 867 A.2d 891, 897 (Del. 2005) (same); *Potter v. Blackburn*, 850 A.2d 294, 297 (Del. 2004) (same); *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 832 (Del. 1995) (same); *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (same).

[60] *See Cassidy v. Cassidy*, 689 A.2d 1182, 1184-85 (Del. 1997) (stating that interests of justice did not require court to consider whether a statute was unconstitutionally vague or whether the court engaged in unconstitutional delegation of judicial authority). *But see Turner v. State*, 5 A.3d 612 (Del. 2010) (interests of justice required the Court to review whether the trial judge left the courtroom before the defense finished closing argument because, if true, the trial judge's behavior would have "jeopardize[d] the fairness and integrity of the trial process.") (quoting *Wainright*, 504 A.2d at 1100)).

[61] *Smith*, 47 A.3d at 479 (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

substantial right, or which clearly show manifest injustice."[62] As one learned

treatise states:

> It is axiomatic that an appellate court will generally not review any issue not raised in the court below. This rule is based on the principle that it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. Furthermore, it is unfair to allow a party to choose to remain silent in the trial court in the face of error, taking a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable.[63]

Opponents should have a fair chance to address arguments at the trial court.

It is prudent for the development of the law that appellate courts have the benefits

that come with a full record and input from learned trial judges. Thus, fair

presentation facilitates the process by which the application of rights in an

individual case affects others in other cases and society in general.

Shirley Shawe urges this Court to consider her new argument under the

interests of justice exception because the ruling will have significant implications

for future cases. But that is exactly why we should *not* address her argument. The

record is largely undeveloped, the trial judge did not have the opportunity to make

a thoughtful ruling, and Shirley Shawe's briefs only cursorily address the issue.

Because this Court takes such complex constitutional issues seriously, and because

we cannot see how it was plain error for the Court of Chancery to, without

---

[62] *Wainwright*, 504 A.2d at 1100.
[63] 5 AM. JUR. 2D *Appellate Review* § 618 (2016) (citations omitted).

prompting from the eleven different law firms representing the Shawes' interests in this litigation, fail to assess Shirley Shawe's novel takings argument, we consider the constitutional arguments waived for failure to raise them first in the Court of Chancery.

Finally, Shirley Shawe argues that the Court of Chancery erred when it dismissed with prejudice the derivative claims brought against Elting. Shawe has not appealed the dismissal with prejudice. We agree with the Court of Chancery that Shirley Shawe's active participation in two of the three "coordinated and functionally consolidated" actions before the Court of Chancery put her on notice that the claims could be dismissed based on Shawe's unclean hands. The court also found that Shawe functionally represented Shirley Shawe's ownership interest in the Company. Thus, she is bound by the dismissal with prejudice of the derivative claims brought by Shawe.

## V.

The Court of Chancery's August 13, 2015 opinion and July 18, 2016 order, and the related orders, are affirmed.

**VALIHURA**, Justice, dissenting:

The Court of Chancery generally has broad discretion in fashioning certain equitable remedies.[1] Although this might suggest that this Court should defer to the Chancellor who ordered one of the most extreme remedies possible—a sale of a financially successful corporation over the objections of one or more of its three stockholders—our review of the Court of Chancery's order requires construction of a statute, namely, 8 *Del. C.* § 226 ("Section 226"). Embedded in this choice of remedy is the question of whether a court-appointed custodian has the power to force the sale of a stockholder's stock absent that stockholder's consent. The interpretation of a statute is a question of law which we review *de novo*.[2] My analysis of the statutory scheme suggests that the answer is "no." Accordingly, I

---

[1] The Court of Chancery has broad discretion, for example, in fashioning a remedy for a fiduciary violation, and the propriety of such a remedy is ordinarily reviewed for abuse of discretion. *See Berger v. Pubco Corp.*, 976 A.2d 132, 139 (Del. 2009) (*en banc*). But, here, there were express findings post-trial that there were no breaches of fiduciary duty. *See, e.g.*, *In re Shawe & Elting LLC,* 2015 WL 4874733, at *34 (Del. Ch. Aug. 13, 2015) ("In sum, the asserted acts of misconduct committed by Shawe that Elting has identified—although disturbing and contrary to expected norms of behavior—do not establish the very high level of fiduciary misconduct resulting in harm to the Company or its stockholders (in their capacity as stockholders) necessary to impose the remedy of equitable dissolution."). Instead, the Court of Chancery was fashioning a remedy pursuant to Section 226, where this Court has held that the intrusion into the business of the corporation must be kept to a minimum. *See Giuricich v. Emtrol Corp.*, 449 A.2d 232, 240 (Del. 1982).

[2] *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015); *see also N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380-81 (Del. 2014) ("[W]e do not defer to the trial court on embedded legal conclusions and review them *de novo*." (citations omitted)), *as revised* (Nov. 10, 2014).

respectfully DISSENT.[3]

Given that we are faced with a question as to the permissible limits of the Court of Chancery's power under Section 226, the flexibility typically afforded the Court of Chancery in fashioning equitable remedies must yield to the more specific principles underlying the relevant statutory provisions and common law interpreting these provisions.[4] The first principle concerns the uncontested fact that, in the DGCL, stock is "personal property" and is generally subject to traditional property law policies favoring free alienation.[5] Generally, where the

---

[3] Much of the Majority Opinion addresses the Court of Chancery's power to appoint a custodian—a proposition that is not seriously contested by anyone here. Rather, it is the Modified Auction's forced sale provisions that are chiefly at issue. As to that main issue, the Majority declines to formally address the key statutory arguments on the grounds of waiver. Instead, they offer several pages of pure *dicta* on the issue. I believe that the statutory arguments are fairly encompassed within Shawe's explicit argument below—that the Court of Chancery should not order a sale under Section 226. Clearly, Section 226 and its proper scope have been a central focus all along. Given that fact, I do not see how a statutory analysis credibly can be avoided. *See, e.g.*, *N. River*, 105 A.3d at 382-83 (rejecting a Rule 8 challenge and allowing additional reasoning to be presented in support of a "broader issue" that had been raised); *Mundy v. Holden*, 204 A.2d 83, 87 (Del. 1964) ("[W]hen the argument is merely an additional reason in support of a proposition urged below, there is no acceptable reason why in the interest of a speedy end to litigation the argument should not be considered." (citation omitted) (internal quotation marks omitted)).

[4] *See, e.g., STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 n.2 (Del. 1991) ("Again, we emphasize that our courts must act with caution and restraint when granting equitable relief in derogation of established principles of corporate law." (citing *Ala. By-Prods. Corp. v. Neal,* 588 A.2d 255, 258 (Del. 1991))). Even under an "abuse of discretion" standard of review, the trial court's discretion is not unlimited. *See, e.g.*, 1 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* 118 (2d ed. 1993) ("With the equitable remedy, the injunction should restore the plaintiff to her entitlement, no more, no less.").

[5] *See* 2 Drexler, Black & Sparks, *Delaware Corporation Law and Practice* § 22.01 at 22-2 (2015) ("[C]orporate stock is personal property," and "[t]he free alienability of personal property is a valuable attribute of property ownership worthy of protection by the courts."); 12 *Fletcher Cyc. Corps.* § 5452 (Sept. 2016) ("The owner of the shares, as in the case of other personal property, has an absolute and inherent right, as an incident of his or her ownership, to sell or

2

possibility of defeasance of a stockholder's stock may occur over the stockholder's objection, those restraints on free transferability and alienation of stock are expressly set forth in the relevant statute. That fact strongly suggests that Section 226 should not be so broadly read as to allow for a forced sale or other divestiture of a stockholder's stock by mere implication. The second principle is the long-standing, uncontested common law principle that the involvement of the Court of Chancery and court-appointed custodians in a corporation's business and affairs should be kept to a minimum.[6] This long-standing common law view is reflected in the fact that the parties here cannot point to a single case in the history of our Section 226 jurisprudence where a court has ordered a custodial sale of a company over a stockholder's objections. These specific policies should be the analytical focal point in construing Section 226 and the permissible limits of the trial court's power.[7]

---

transfer the shares at will, except insofar as the right may be restricted by the articles of incorporation, bylaws, an agreement among shareholders, or between shareholders and the corporation.").

[6] *See, e.g.*, *Giuricich*, 449 A.2d at 240.

[7] We followed this statute-oriented approach, for example, in *Berger*, where we considered "what remedy [was] appropriate in a 'short form' merger under 8 *Del. C.* § 253, where the corporation's minority stockholders [were] involuntarily cashed out without being furnished [with] the factual information material to an informed shareholder decision whether or not to seek appraisal." *Berger*, 976 A.2d at 133. In evaluating four possible alternative remedies, this Court stated that "the optimal alternative would be the remedy that best effectuates the policies underlying the short form merger statute (Section 253), [and] the appraisal statute (Section 262) . . . , taking into account considerations of practicality of implementation and fairness to the litigants." *Id.* at 140. Likewise, the focus here should be on proper construction of Section 226 in resolving the question of the scope of the Court of Chancery's power.

3

The appellants add a constitutional gloss on appeal that was not raised below, namely, they contend that a forced sale of their stock might well constitute an unconstitutional "taking" of their personal property in violation of the Fifth Amendment to the United States Constitution and of Article I, Section 8 of the Delaware Constitution. They contend that in order to avoid this potential constitutional problem, Section 226 ought to be construed more narrowly in favor of the implementation of less drastic remedies. The "takings" argument presents novel issues of first impression, which I would not reach.

A holistic reading of the DGCL supports the view that divestiture of a stockholder's stock may occur over the stockholder's objection in a number of situations—but only when the relevant statute expressly so provides.[8] Examples where a stockholder is forced to give up her shares have one thing in common— the relevant statutory provisions expressly contemplate that situation and provide fair notice that it may occur. Here, Section 226 contains no such express provision or notice of such potential forced divestiture. I know of no situations in the DGCL where a forced sale of stock can occur absent fair notice, and the Majority cites to none. The absence of authority grounded in the statute, the conceded absence of any similar cases under Section 226, and our common law's strong preference for the least intrusive remedies in cases involving court-appointed custodians suggest

---

[8] *See Grimes v. Alteon Inc.*, 804 A.2d 256, 260 (Del. 2002) (*en banc*) ("One must read in *pari materia* the relevant provisions of the Corporation Law." (italics added)).

that the Chancellor went too far too fast in ordering the Modified Auction.

## I.

### The Statutory Scheme Suggests that the Court of Chancery Lacked the Power to Order Stockholders to Sell Their Shares

In its current form, Section 226(a) permits the Court of Chancery to appoint a custodian in the event of stockholder deadlock, director deadlock, or abandonment of the corporation:

> The Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians and, if the corporation is insolvent, to be receivers, of and for any corporation when:
>
> (1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors; or
>
> (2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division; or
>
> (3) The corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets.[9]

In the case of shareholder deadlock, as here, "[t]he decision to appoint a custodian . . . is committed to the [c]ourt's discretion" and does not require a

---

[9] 8 *Del. C.* § 226(a).

5

showing of irreparable injury to the corporation.[10]

Section 226(b) sets forth the authority of the custodian and states that the custodian's authority is to continue the business of the corporation and not to liquidate its affairs and distribute its assets:

> A custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the custodian is to *continue the business of the corporation and not to liquidate its affairs and distribute its assets*, except when the Court shall otherwise order and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title.[11]

In the event of a court-ordered liquidation, the custodian takes custody of the assets of the *corporation*—not of the stockholder's stock (which is the stockholder's personal property).[12] Section 159 of the DGCL provides that "[t]he shares of stock

---

[10] *Miller v. Miller*, 2009 WL 554920, at *3-4 (Del. Ch. Feb. 10, 2009), *as revised* (Feb. 17, 2009).

[11] 8 *Del. C.* § 226(b) (emphasis added). Section 291, which governs receivers for insolvent corporations, provides:

> Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or more persons to be receivers of and for the corporation, to take charge of its assets, estate, effects, business and affairs, and to collect the outstanding debts, claims, and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, to appoint an agent or agents under them, and to do all other acts which might be done by the corporation and which may be necessary or proper. The powers of the receivers shall be such and shall continue so long as the Court shall deem necessary.

*Id.* § 291.

[12] In a liquidation under Section 226(b), the corporation's property is sold. The stockholders continue to own shares, but the corporation is no longer a going concern, and its operating assets are replaced with cash. Liquidation is available by court order and when a corporation has abandoned its business, is insolvent, or needs to wind up its affairs—circumstances

6

in every corporation shall be deemed personal property and transferable as provided in Article 8 of subtitle I of Title 6."[13] This Court, in *Grimes v. Alteon*,[14] stated that "[s]hares of stock are 'a species of property right' that is of 'foundational importance to our economic system.'"[15]

Although the powers of the custodian under Section 226 are defined by reference to Section 291, as this Court has stated, Section 226 powers "are not as unlimited as the powers of a receiver appointed under the general equitable powers of the court, or under the forerunner to the present [Section] 226(a)(1)."[16] Nor does Section 291 grant the receiver power over the personal property of the stockholders, although a receiver may sell the property of the corporation under

---

unquestionably not present here. Thus, I disagree with the Majority's statement that "in the context of this case, making a distinction between liquidation and sale has no real practical effect." Majority Op. at 24. The Majority further suggests that, after remand, the Court of Chancery could order TPG's assets liquidated through a sale process and distribute the proceeds to the stockholders. *Id.* at 25. It further contends that "Shawe concedes as much." *Id.* (citing Opening Br. of Philip R. Shawe at 18-19). Shawe's statements cannot be fairly viewed as a concession that liquidation was an option here. No party during this appeal has even suggested that either a liquidation or a sale of assets is an option.

[13] 8 *Del. C.* § 159.

[14] 804 A.2d 256 (Del. 2002).

[15] *Id.* at 262 (internal omission removed) (quoting *Kalageorgi v. Victor Kamkin, Inc.*, 750 A.2d 531, 538 (Del. Ch. 1999)).

[16] *Giuricich*, 449 A.2d at 237; *see also id.* at 240 (holding in that case that the powers of the custodian "shall be sharply limited"). Indeed, the default statutory obligation under Section 226 is to continue the business and not to liquidate its affairs or distribute its assets. The Majority, in focusing on the reference to powers under Section 291, ignores the limitation on that power which immediately follows that reference—which is "*but* the authority of the custodian is to continue the business . . . ." 8 *Del. C.* § 226(b). I address the exceptions to that default statutory rule in footnote 52.

7

certain circumstances.[17]

Review of the relevant statutory scheme suggests that it is unlikely that the General Assembly intended to permit a stockholder's fundamental personal property rights to be abridged by mere implication. Where the DGCL does so permit restrictions on the stockholder's free transferability and alienation of her stock, including forced dispositions and transfers of stock ownership, it does so expressly. Examples include Section 251(c) (permitting approval of mergers by a majority of stockholders, such that dissenting stockholders are divested of their stock subject only to appraisal rights under Section 262); Section 273 (authorizing dissolution of a joint venture owned by two 50% stockholders); and Section 303(a) (involving actions that may be taken in bankruptcy proceedings that are deemed to be unanimous actions of the stockholders).

As to the first of these examples, the DGCL contemplates the conversion of shares when corporations merge.[18] Section 251 of the DGCL governs mergers. Subsections 251(b) and (c) set forth requirements that a merger agreement must satisfy. Section 251(b)(5), for example, provides that a merger agreement shall

---

[17] *See* 8 *Del. C.* § 297.

[18] *Id.* § 251(c) ("*If a majority of the outstanding stock of the corporation entitled to vote* thereon shall be voted for the adoption of the [merger] agreement, that fact shall be certified on the agreement by the secretary or assistant secretary of the corporation, provided that such certification on the agreement shall not be required if a certificate of merger or consolidation is filed in lieu of filing the agreement. *If the agreement shall be so adopted* and certified by each constituent corporation, *it shall then be filed and shall become effective*, in accordance with § 103 of this title." (emphasis added)).

state:

> The manner, if any, of converting the shares of each of the constituent corporations into shares or other securities of the corporation or resulting from the merger or consolidation, or of cancelling some or all of such shares, and, if any shares of any of the constituent corporations are not to remain outstanding, to be converted solely into shares or other securities of the surviving or resulting corporation or to be cancelled, the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange for, or upon conversion of such shares and the surrender of any certificates evidencing them, which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation[.]"[19]

Section 251(c) requires that the merger agreement required by subsection (b) be submitted to the stockholders at an annual or special meeting "for the purpose of acting on the agreement."[20] It also sets forth notice requirements. Because the power to merge is expressly conferred by statute, every stockholder of a Delaware corporation accepts his or her shares with notice of these provisions. Though a stockholder might be able to pursue an appraisal action to ensure he or she has received adequate compensation,[21] he or she cannot prevent the merger from

---

[19] *Id.* § 251(b)(5). The legislative synopsis of the 2003 amendment to Section 251(b)(5) states:

> The amendments to Sections 251, 252, 253, 254, 255, 256, 257, 263 and 264 clarify that shares or other interests of a constituent corporation or other entity to a merger or consolidation may be converted, cancelled or unaffected by the merger.

Del. S.B. 84 syn., 142d Gen. Assem. (2003).

[20] 8 *Del. C.* § 251(c).

[21] *See id.* § 262.

proceeding on the basis of absence of consent.[22]  Importantly, it is clear from the express words of the statute that this outcome is a possibility.[23]

Section 273 applies to joint ventures owned in equal parts by two stockholders and expressly allows for dissolution over the objection of one of them.[24]  Its purpose is to alleviate a "fundamental deadlock" by "removing the need for obtaining a unanimous vote[.]"[25]  Section 273 "contemplates that the Court of Chancery will enforce an agreed-upon disposition of the assets or, absent such agreement, that the court may order compulsory dissolution of the venture."[26]  Thus, Section 273 expressly permits dissolution of a joint venture even if one 50% owner objects.  "The legislature enacted Section 273 to provide a speedy method of dissolving a joint venture corporation when its two 50/50 shareholders are in

---

[22] Assuming the merger was otherwise beyond reproach.

[23] The Majority states that, "[m]any Delaware statutes, including those dealing with certain mergers, subject stockholders to giving up their shares over their objection."  Majority Op. at 22. I agree.  The point the Majority completely fails to address is that all of these statutes expressly provide fair notice to stockholders that this may occur.

[24] The Majority acknowledges that this case "does not fall precisely under [Section] 273[,]" presumably because the Company has three stockholders and is not a joint venture.  Majority Op. at 23.  Being "within a whisker" of Section 273 ignores the core principle that "[t]he legislative body is presumed to have inserted every provision for some useful purpose and construction, and when different terms are used in various parts of a statute it is reasonable to assume that a distinction between the terms was intended."  *Giuricich*, 449 A.2d at 238 (internal quotation marks omitted) (citation omitted).  For the same reason, it is unreasonable to broadly read the "except when the Court shall otherwise order" language in Section 226 as affording the trial court broad discretion to employ Section 273's remedial provisions.  *See* Majority Op. at 22-23.

[25] *In re Arthur Treacher's Fish & Chips*, 1980 WL 268070, at *3-4 (Del. Ch. July 1, 1980).

[26] Edward P. Welch, Robert S. Saunders, & Jennifer C. Voss, *Folk on the Delaware General Corporation Law* § 273.1, at 10-63 (6th ed. 2016).

10

deadlock."[27]  Section 273(a) provides, in relevant part:

> If the stockholders of a corporation of this State, having only 2 stockholders each of which own 50% of the stock therein, shall be engaged in the prosecution of a joint venture and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture and disposing of the assets used in such venture, *either stockholder may, unless otherwise provided in the certificate of incorporation of the corporation or in a written agreement between the stockholders*, file with the Court of Chancery a petition stating that it desires to discontinue such joint venture and to dispose of the assets used in such venture in accordance with a plan to be agreed upon by both stockholders or that, if no such plan shall be agreed upon by both stockholders, the corporation be dissolved. . . .[28]

"Accordingly, the Court may provide relief to a shareholder if (1) the corporation has only two 50% shareholders (2) who are prosecuting a joint venture and (3) who are unable to agree on discontinuing the joint venture."[29]  The Majority's attempt to bring this case within the ambit of Section 273 ignores the significance of that separate statute—a point acknowledged by the Chancellor, who agreed that Section 273 did not apply.[30]

Section 303(a) provides that corporate actions taken pursuant to orders of the courts in federal bankruptcy proceedings may be taken "without further action by

---

[27] *Wah Chang Smelting & Refining Co. of Am. v. Cleveland Tungsten Inc.*, 1996 WL 487941, at *3 (Del. Ch. Aug 19, 1996) (citations omitted).

[28] 8 *Del. C.* § 273(a) (emphasis added).

[29] *Wah Chang*, 1996 WL 487941, at *3 (citing *In re Coffee Assocs., Inc.*, 1993 WL 512505 (Del. Ch. Dec. 3, 1993)).

[30] *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *2 n.7 ("Elting initially asserted a claim for dissolution in C.A. No. 9700-CB under 8 *Del. C.* § 273.  Ms. Shawe's legal ownership of one percent of TPG made that statute inapplicable, and Elting appropriately withdrew that claim.").

[the corporation's] directors or stockholders" and that "[s]uch power and authority may be exercised" by a representative appointed by the court "with like effect as if exercised and taken by unanimous action of the directors and stockholders of the corporation."[31] These actions may allow the corporation, for example, to:

> amend its certificate of incorporation, and make any change in its capital or capital stock, or any other amendment, change, or alteration, or provision, authorized by this chapter; be dissolved, transfer all or part of its assets, merge or consolidate as permitted by this chapter, in which case, however, no stockholder shall have any statutory right of appraisal of such stockholder's stock . . . .[32]

In contrast to each of the provisions above, Section 226 contains no language that suggests that a court-ordered custodian has the power to compel a forced disposition of a stockholder's personal property (stock).

Relatedly, other provisions of the DGCL address restrictions on transfers of stock and also make clear that restrictions must be stated expressly and clearly. For example, restrictions are often utilized in closely held corporations in order to protect the utilization of certain tax treatment. Section 202 sets forth requirements for a valid restriction on the transfers of securities. The restriction must be "noted conspicuously" on the stock certificate, and it may be imposed in the corporation's certificate of incorporation or bylaws.[33] Also, "[u]nless noted conspicuously" on

---

[31] 8 *Del. C.* § 303(a).

[32] *Id.* § 303(b).

[33] *Id.* § 202(a)-(b).

12

the stock certificate, such restrictions are "ineffective except against a person with actual knowledge of the restriction."[34] Notably, the "noted conspicuously" and "actual knowledge" phrases are derived from the Uniform Commercial Code (the "UCC") as adopted in Delaware (to which Section 159 refers) and "should be interpreted in light of the relevant Code definitions."[35]

Although Delaware courts generally have been reluctant to invalidate stock restrictions,[36] this approach is "consistent with the general principle that Delaware corporate law is enabling, and does not impose choices on market participants."[37] "Delaware public policy generally empowers market participants to decide for themselves whether to enter into contracts restricting their right to sell their shares."[38] But a forced transfer, untethered to any express statutory authorization, and absent notice of such possible defeasance, divestiture, or transfer, is counter to the principles of free alienation. The general view that the DGCL is broadly enabling does not undercut the conclusion that Section 226 ought to be construed

---

[34] *Id.* § 202(a). Section 202(c) describes various types of restrictions on transfers of securities which are permissible under that Section.

[35] *Folk*, *supra* note 26, § 202.06 at 6-19 (listing the following UCC provisions: 6 *Del. C.* § 1-201(10) ("conspicuous") and 6 *Del. C.* § 1-202 (definitions of "notice," "knowledge," etc.)).

[36] *Capital Grp. Cos., Inc. v. Armour*, 2005 WL 678564, at *9 (Del. Ch. Mar. 15, 2005).

[37] *Id.* This is clear in a number of different contexts. *See, e.g.*, *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. . . . Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority." (citations omitted)).

[38] *Agranoff v. Miller*, 1999 WL 219650, at *16 (Del. Ch. Apr. 12, 1999) (citing 8 *Del. C.* § 202), *aff'd as modified*, 737 A.2d 530, 1999 WL 636634 (Del. July 28, 1999) (TABLE).

narrowly by a court to bar a custodian's sale of a stockholder's stock absent consent. Rather, the enabling aspect of the DGCL implies an element of consensual structuring of the corporate contract concerning the relevant participants.[39]

To further illustrate the importance attributed to fair notice in the DGCL, in *Grimes*, this Court identified as one of "two fundamental policies of Corporation Law" ensuring "certainty in the instruments upon which the corporation's capital structure is based."[40] This Court repeated the need for "strict adherence to statutory formality in matters relating to the issuance of capital stock" and noted that "Delaware's statutory structure implements these policies through a 'clear and easily followed legal roadmap' of statutory provisions."[41] There, this Court rejected a claim of validity of an oral promise made to a stockholder by the CEO to sell ten percent of the corporation's future private stock offering to the stockholder. This Court held that Sections 151, 152, 153, 157, 161, and 166 of the DGCL, when read together, "contemplate board approval and a written instrument evidencing

---

[39] *See, e.g., Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 845 (Del. Ch. 2004) (noting that the DGCL is "widely regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints"); *see also Folk, supra* note 26, § 202.6, at 6-20 n.58 (observing that "[t]he argument that a restriction may be imposed without the stockholder's consent, based upon a reserved general power to amend the corporation's certificate, has been rejected" (citing *B & H Warehouse, Inc. v. Atlas Van Lines, Inc.*, 490 F.2d 818, 825-26 (5th Cir. 1974))).

[40] *Grimes*, 804 A.2d at 260 (citing *Kalageorgi*, 750 A.2d at 538-39).

[41] *Id.* (quoting *Kalageorgi*, 750 A.2d at 538).

14

the relevant transactions affecting issuance of stock and the corporation's capital structure."[42] In the instant case, although factually distinguishable, the same need for "[c]ertainty in investor expectations"[43] suggests a court should not have power to order stockholders to sell their stock to a third party over their objections—without, at least, advance statutory fair notice to stockholders of such a possibility.

This narrower construction of Section 226 is further supported by examining the special provisions for close corporations in Sections 352 and 353, which also embody concepts of notice and consent, as well as a statutory preference for less drastic, interim remedies to address deadlock situations. For example, Sections 352 and 353 expressly provide for provisional directors in deadlock situations. Section 352 empowers the Court of Chancery, in addition to Section 226, to appoint a custodian for a close corporation in two scenarios. The first is where "[p]ursuant to § 351 of this title the business and affairs of the corporation are managed by the stockholders and they are so divided that the business of the corporation is suffering or is threatened with irreparable injury and any remedy with respect to such deadlock provided in the certificate of incorporation or bylaws

---

[42] *Id.* at 261. Section 166, for example, "relating to the formalities required of stock subscriptions, provides that subscription agreements are not enforceable against the subscriber unless in writing and signed by the subscriber." *Id.*

[43] *Id.* at 266.

or in any written agreement of the stockholders has failed[.]"[44]  The second occurs where a stockholder has the "right to the dissolution of the corporation under a provision of the certificate of incorporation permitted by § 355 of this title."[45] Notably, under Section 355, a stockholder of a close corporation does not have a right of dissolution unless that right is provided in the corporation's charter. Again, the concepts of fair notice and consent are expressly set forth in the statute. Subsections 355(b) and (c) provide:

> (b) *If the certificate of incorporation as originally filed does not contain* a provision authorized by subsection (a) of this section, the certificate may be amended to include such provision *if adopted by the affirmative vote of the holders of all the outstanding stock*, whether or not entitled to vote, unless the certificate of incorporation specifically authorizes such an amendment by a vote which shall be not less than 2/3 of all the outstanding stock whether or not entitled to vote.

---

[44] 8 *Del. C.* § 352(a)(1).  To invoke management by the stockholders pursuant to Section 351, the corporation must be a close corporation, its certificate of incorporation must "provide that the business of the corporation shall be managed by the stockholders of the corporation rather than by a board of directors[,]" and the existence of the provision on the certificate must be "noted conspicuously on the face or back of every stock certificate issued by such corporation."  *Id.* § 351.  If these requirements are satisfied, such corporations may avoid calling stockholder meetings to elect directors, all stockholders are by default considered directors, and all stockholders are "subject to all liabilities of directors."  *Id.*  Because TransPerfect is not a close corporation and is managed by a board of directors, Section 351 does not apply and, likewise, neither does the possibility of seeking appointment of a custodian pursuant to Section 352(a)(1).  However, the General Assembly's approach to deadlock in the context of close corporations is relevant, particularly since TransPerfect has only three stockholders.

[45] *Id.* § 352(a)(2).  Section 355 permits a close corporation to provide in its certificate of incorporation that one or more stockholders, or a percentage of the stockholders, may force the corporation to dissolve.  *Id.* § 355(a).  The provision will not be effective unless each of the corporation's stock certificates "conspicuously note[s]" the existence of the provision.  *Id.* § 355(c).  *Cf. Fletcher*, *supra* note 5, at § 8035 ("[S]tatutory provisions for judicial dissolution of corporations are strictly construed.").

(c) *Each stock certificate in any corporation whose certificate of incorporation authorizes dissolution* as permitted by this section shall *conspicuously note on the face thereof the existence of the provision.* Unless noted conspicuously on the face of the stock certificate, the provision is ineffective.[46]

As an alternative to appointing a custodian, Section 353(a) provides:

[T]he Court of Chancery may appoint a provisional director for a close corporation if the directors are so divided respecting the management of the corporation's business and affairs that the votes required for action by the board of directors cannot be obtained with the consequence that the business and affairs of the corporation can no longer be conducted to the advantage of the stockholders generally.[47]

Additionally, "Section 352(b) expressly invites the [c]ourt to opt for the less intrusive remedy of a provisional director as authorized by Section 353 if the [c]ourt concludes that such an alternative order would be in the best interests of the corporation. Accordingly, the [c]ourt is authorized—and, by virtue of this provision, mildly encouraged—to consider resort to that more limited remedy even if the petition itself makes no application for such relief."[48]

Delaware law also provides for both statutory and equitable dissolution of Delaware corporations, either of which may cause the involuntary divestiture of stockholders' personal property interests. Subchapter X of the DGCL details the

---

[46] 8 *Del. C.* § 355(b)-(c) (emphasis added).

[47] *Id.* § 353(a).

[48] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 8.09[e][1], at 8-221 (Matthew Bender & Co. 2014) (footnote omitted).

procedures for dissolution.[49]  Section 275 provides, in relevant part:

> (a) If it should be deemed advisable in the judgment of the board of directors of any corporation that it should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole board at any meeting called for that purpose, shall cause notice of the adoption of the resolution and of a meeting of stockholders to take action upon the resolution to be mailed to each stockholder entitled to vote thereon as of the record date for determining the stockholders entitled to notice of the meeting.
>
> (b) At the meeting a vote shall be taken upon the proposed dissolution.  *If a majority of the outstanding stock of the corporation entitled to vote thereon shall vote for the proposed dissolution*, a certification of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.
>
> (c) Dissolution of a corporation may also be authorized without action of the directors *if all the stockholders entitled to vote thereon shall consent in writing* and a certificate of dissolution shall be filed with the Secretary of State pursuant to subsection (d) of this section.[50]

The dissolution process contemplated by Section 275 is voluntary in that dissolution will only occur if a majority of stockholders either vote in favor of the dissolution or consent of all stockholders to the dissolution is obtained in writing.  However, much like a merger under the DGCL, a dissenting stockholder may be involuntarily divested of his or her property interest even if he or she votes against the majority.[51]  The dissolution statutory scheme contemplates both relinquishment

---

[49] 8 *Del. C.* §§ 271-85.

[50] *Id.* § 275.

[51] The Court of Chancery's power to order equitable dissolution also does not support the argument that the court has broad power to order a custodian to sell a corporation over the objections of stockholders in these circumstances.  Under the doctrine of equitable dissolution, a court of equity "may order the dissolution of a solvent company and the appointment of a

of an interest in personal property and the protective mechanism of a stockholder vote.

At oral argument, there was a suggestion that Ms. Shawe conceded in her Reply Brief that the Court of Chancery had the power to order dissolution or liquidation here and that, *a fortiori*, the Court could have ordered a sale of the entire company. I did not read Ms. Shawe's Reply Brief to concede that either dissolution or liquidation would be appropriate here, and, indeed, at oral argument her counsel strongly contended that the references in her Reply Brief were intended to apply only when a company is insolvent—a situation unquestionably not present here. I disagree with that suggestion, in any event, since Section 226(b) explicitly establishes the overarching requirement that "the authority of the

custodian or receiver 'only upon a showing of gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented.'" *Carlson v. Hallinan*, 925 A.2d 506, 543 (Del. Ch. 2006) (quoting *Chapman v. Fluorodynamics, Inc.*, 1970 WL 806, at *4 (Del. Ch. Mar. 20, 1970)). Courts "exercise[] this power to dissolve a solvent corporation with 'great restraint' and only upon a 'strong showing.'" *Id*. (citations omitted). Further, "[m]ere dissension among corporate stockholders seldom, if ever, justifies the appointment of a receiver for a solvent corporation." *Id.* (quoting *Hall v. John S. Isaacs & Sons Farms, Inc.*, 163 A.2d 288, 293 (Del. Ch. 1960)); *see also VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *5 (Del. Ch. Apr. 28, 2014) ("Where the company is solvent, a 'strong showing' is necessary to invoke [the remedy of the equitable appointment of a receiver, which] should 'not be resorted to if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights.'" (footnotes omitted) (citations omitted)); *Theodora Hldg. Corp. v. Henderson*, 257 A.2d 398, 406 (Del. Ch. 1969) ("It is plain, we think, that for a court to order a dissolution or liquidation of a solvent corporation, the proponents must show . . . a fraudulent disregard of the minority's rights, or some other fact which indicates an imminent danger of great loss resulting from fraudulent or absolute mismanagement." (citations omitted) (internal quotation marks omitted)). The Court of Chancery expressly found that equitable dissolution was not warranted here because "the record does not show that Shawe engaged in self-dealing or financially enriched himself at the Company's expense." *In re Shawe & Elting, LLC*, 2015 WL 4874733 at *34.

19

custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets." A dissolution under the circumstances here would be inconsistent with that express statutory requirement.[52] No one has seriously

---

[52] Moreover, the language in Section 226(b) creating three circumscribed "exceptions" to the general requirement that a custodian "continue the business of the corporation and not . . . liquidate its affairs and distribute its assets," cannot reasonably be read to authorize the forced sale of a solvent corporation to a third party over the objections of its stockholders. The exceptions in Section 226(b) allow for deviation from the general rule that the custodian must continue the business only "when the Court shall otherwise order and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title." 8 *Del. C.* § 226(b). First, this "exception" language does not provide express notice of a possible defeasance of one's ownership interest in stock—unlike other statutes which explicitly contemplate defeasance, whether voluntary or involuntary, as a possibility. Nor does Section 226's reference to Section 291 provide sufficient notice of such a possible defeasance, since, among other things, Section 291 applies only to insolvent corporations. The Majority avoids this point altogether.

Second, the three exceptions necessarily modify the custodian's default obligation to continue the business of the corporation and not to liquidate its affairs or distribute its assets. The second and third exceptions simply provide for limited circumstances in which a custodian's default obligation does not apply—namely, where a corporation has abandoned its business (as in Section 226(a)(3)) or where a stockholder in a close corporation has the right, pursuant to the close corporation's certificate of incorporation, to dissolution of the close corporation (as in Section 352(a)(2)).

The first exception ("except when the Court shall otherwise order") logically should be read in the context of the second and third exceptions—both of which explicitly identify limited circumstances in which a custodian has no obligation to continue the business of the corporation. It is unreasonable, then, to read the first exception as empowering the Court of Chancery to fashion a remedy wholly incongruous with the two other exceptions. Therefore, the first exception, as the second and third, can only reasonably be read to allow only for a similar discontinuation of the business (*e.g.*, liquidation, distribution of assets, or dissolution).

In short, the exceptions in Section 226(b) do not authorize a forced sale of this solvent corporation to a third party over the objections of stockholders. Perhaps that is why the Majority endeavors mightily to equate the proposed forced auction of TransPerfect to one of the scenarios contemplated by the exceptions in Section 226(b) (which contemplate discontinuation of the business)—a liquidation, a dissolution, or a distribution of assets. The problem with that lies in the fact that a sale or auction of a thriving business is a far cry from a liquidation, dissolution, or distribution of assets. The remedy of a sale does not contemplate, as do liquidation, dissolution, and distribution of assets, the winding up of a corporation's business. Thus, to the limited extent that Section 226(b) empowers a custodian to undertake a liquidation, dissolution, or distribution of assets, that power does not, *a fortiori*, allow a custodian to auction the corporation over the objections of its stockholders.

20

argued on appeal that a dissolution, an asset sale, or a liquidation is an option.[53] The Majority acknowledges that "[n]either Elting nor Shawe want an asset sale," which it says could result in "ruinous consequences[.]"[54]

Other involuntary divestitures outside the corporate arena support the concept that express statutory authorization is needed for a court-ordered forced sale to occur. For example, "[e]quity courts have historically upheld the right of a tenant in common to seek a partition of personal property."[55] The partition of real property is contemplated by 25 *Del. C.* § 721(a), which provides:

> When any 2 or more persons hold lands and tenements within this State as joint tenants or tenants in common, or as parceners under the intestate laws of this State, or when any persons hold an interest either in possession or in remainder in lands and tenements within this State, . . . any 1 or more of them . . . may present a petition to the Court of Chancery . . . . The petition shall state the facts, describe the lands and tenements so held, and pray partition thereof among the several parties entitled to such lands and tenements according to their several and respective interests.[56]

---

[53] The Majority's statement that I have suggested that "a lesser remedy like asset sales and dissolution" would be more acceptable remedies is perplexing and just plain wrong. Majority Op. at 24. Nowhere do I suggest that they are "lesser remedies" or that stockholders of solvent companies would prefer these remedies.

[54] *Id.* at 24.

[55] *JFL, Inc. v. NJE Aircraft Corp.*, 1988 WL 58274, at *2 (Del. Ch. June 2, 1988); *see Carradin v. Carradin*, 1980 WL 10015, at *2 (Del. Ch. Jan. 31, 1980) ("A bill seeking partition of personal property is unquestionably within the historical jurisdiction of equity courts[.]").

[56] 25 *Del. C.* § 721(a); *see id.* § 751 (conferring on the Court of Chancery "general equity powers" to effect partition).

"Partition means a severance of interests which are concurrent."[57] "The purpose of a partition proceeding is to eliminate a present concurrent interest in the same property so that each owner may enjoy and possess his or her interest in severalty."[58] As a general rule, a co-owner's right to seek partition of jointly owned property is "almost absolute, since the right is an incident of common ownership."[59] Importantly, this remedy is part of a statutory scheme that expressly contemplates the relinquishment of some or all of co-owners' property interests, including by a court-ordered sale.[60]

The Court of Chancery's decisions appointing a custodian and accepting the Custodian's recommendation with respect to the Modified Auction contain no textual analysis of the relevant statutory scheme. Instead, the Chancellor relied on two cases, which are distinguishable due to the presence of stockholder consent to

---

[57] *Peters v. Robinson*, 636 A.2d 926, 929 (Del. 1994) ("Such types of contemporaneous co-ownerships are usually either joint tenancies or tenancies in common.").

[58] *Id*. (citations omitted).

[59] *Hamilton v. Hamilton*, 597 A.2d 856, 859 (Del. Fam. Ct. 1990) (citing 68 C.J.S. Partition § [30]) (additional citation omitted); *see also Chalfant v. Cornett*, 1996 WL 162262, at *2-4 (Del. Ch. Mar. 25, 1996) (discussing the limited circumstances in which courts may equitably deny the right to partition). Similarly, Delaware law provides for the equitable division, distribution, and assignment of marital property in proceedings for divorce or annulment. *See* 13 *Del. C.* § 1513(a).

[60] *See* 25 *Del. C.* §§ 729, 733; *Libeau v. Fox*, 892 A.2d 1068, 1071 (Del. 2006) ("If a physical division of the property would be detrimental to the co-owners' interests, the Court of Chancery may order that the property be sold at public auction and the proceeds divided among the co-owners.").

the sales in both of those cases. In *Bentas v. Haseotes*,[61] the parties agreed that liquidation was necessary but disagreed on the method that would "maximize stockholder value."[62] In *Fulk v. Washington Service Associates, Inc.*,[63] the parties "endorse[d]" and "support[ed]" a custodian's plan for sale of a corporation pursuant to Section 273, objecting only to certain closing terms.[64]

Moreover, it is no answer, as Ms. Elting suggests, that Section 394 provides that all corporations agree to make all provisions (including Section 226) part of their respective charters.[65] This is a circular argument.[66] The question here is what are the limits, if any, of the court's power under Section 226? Our statutory scheme should be read harmoniously.[67] Reading the statutory scheme

---

[61] 2003 WL 1711856 (Del. Ch. Mar. 31, 2003).

[62] *Id.* at *2-3 (describing the parties' competing plans for liquidation).

[63] 2002 WL 1402273 (Del. Ch. June 21, 2002).

[64] *Id.* at *6.

[65] 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation."). The Majority suggests that when stockholders buy stock in a Delaware corporation, they should understand that the "Court of Chancery has broad authority to address corporate deadlocks" and to "deal sensibly with corporations[.]" Majority Op. at 23. What is sensible, though, is that investors should be able to expect that courts will adhere to the statutory and common law road map respecting capital stock. The words "otherwise order" do not constitute adequate notice that a stockholder could be forced to sell her holdings in a forced auction of a thriving company.

[66] The circularity of Ms. Elting's argument is apparent. For example, she contends that "[Ms. Shawe's] interest in the Company has always been subject to all the provisions of the [DGCL], including [S]ection 226, which constitutes an integral part of [the Company's] charter and authorizes the court-ordered sale at issue." Answering Br. at 4.

[67] *See Grimes*, 804 A.2d at 260, 265 n.35 (citing 2A Norman J. Singer, *Sutherland on Statutory Construction* § 46:05 (2000) ("[E]ach part or section [of a statute] should be construed in

harmoniously compels the conclusion that Section 226 does not permit the Court of Chancery to confer upon a custodian the power to sell a corporation over the objection of its shareholders.  Thus, I believe that the Court of Chancery erred by ordering the Modified Auction.

## II.

### The Common Law Rule of Judicial Restraint Regarding Custodial Powers Suggests a More Limited Remedy

Similarly, the policies of judicial restraint embedded in our common law underlying Section 226 suggest that the Modified Auction Order's forced sale provision goes too far.  Historically, "the common law generally disdained judicial relief of any kind with respect to a solvent but deadlocked corporation."[68]  Though the pre-1967 iteration of Section 226 vested in the Court of Chancery the discretion to appoint receivers of and for deadlocked corporations, the court was hesitant to interfere in the business of deadlocked but solvent companies.[69]  This Court has

---

connection with every other part or section so as to produce a harmonious whole." (alterations in *Grimes*))).

[68] Wolfe & Pittenger, *supra* note 48, § 8.09[b], at 8-203; *see Salnita Corp. v. Walter Hldg. Corp.*, 168 A. 74, 75 (Del. Ch. 1933) ("A court should never wrest control of a business from the hands of those who have demonstrated their ability to manage it well, unless it be satisfied that no course, short of the violent one, is open as a corrective to great and imminent harm.").

[69] *See Paulman v. Kritzer Radiant Coils, Inc.*, 143 A.2d 272, 272-74 (Del. Ch. 1958) ("Plaintiffs emphasize that this deadlock can go on indefinitely, which is true.  But such a consequence is necessarily implicit in the arithmetic of stock holdings.  In and of itself it is not a sufficient reason to appoint a receiver under the present law."); *see also Hall*, 163 A.2d at 293 ("Under some circumstances courts of equity will appoint liquidating receivers for solvent corporations, but the power to do so is always exercised with great restraint and only upon a showing of gross mismanagement, positive misconduct by the corporate officers, breach of trust, or extreme

24

observed that the General Assembly's intent with respect to the 1967 revisions "was to ease the onerous burden of proof under the prior case law which made the appointment of a receiver for a solvent corporation almost hopeless, despite a potentially permanent shareholder-deadlock."[70]

But even so, this Court has determined that "[t]he involvement of the Court of Chancery and its custodian in the corporation's business and affairs should be kept to a minimum and should be exercised only insofar as the goals of fairness and justice, as stated [in *Giuricich*], require."[71] Consistent with this sentiment, at least since the 1967 revisions, the parties have pointed to no case in which the Court of Chancery has exercised its power under Section 226 to order that a company be sold over stockholder objection.[72] Although cases exist in which the Court of Chancery has authorized a custodian to sell a deadlocked corporation pursuant to Section 226, such authorization has been granted only upon agreement

---

circumstances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented.").

[70] *Giuricich*, 449 A.2d at 238-39 (footnote omitted). This Court has stated that pre-1967 cases applying "general equitable principles" or earlier statutes addressing stockholder deadlock are "neither governing nor persuasive" in applications of the modern version of Section 226. *Id.* at 236. However, the common law backdrop against which today's Section 226 evolved is helpful to understanding the scope of custodial power intended by the General Assembly.

[71]*Id.* at 240; *see Miller*, 2009 WL 554920, at *4.

[72] Also, there appears to be no such court-ordered sales prior to the current version of the statute. *Cf. Tansey v. Oil Producing Royalties, Inc.*, 133 A.2d 141, 146-47 (Del. Ch. 1957) (ordering appointment of a liquidating receiver for a solvent corporation, without noting whether any stockholders objected, due to the gross mismanagement of the corporation by its majority stockholder, who testified at trial that he intended to dissolve the company anyway).

25

by stockholders that a sale was appropriate.  In particular, the cases on which Ms. Elting relies nearly universally involved situations where the stockholders consented to a sale.[73]  For example, in *Fulk*,[74] a stockholder sought relief under Section 273, and a court-appointed custodian recommended a sale process in which one stockholder would buy the other's fifty percent share.[75]  With the exception of certain details,[76] the parties "endorse[d]" and "support[ed]" the custodian's plan.[77]  Likewise, in *Bentas*,[78] the Court of Chancery ordered that a corporation be auctioned only after two stockholder factions submitted competing proposals to liquidate the company.  More recently, in *EB Trust v. Information Management Services, Inc.*,[79] the parties to a Section 226 proceeding "agreed that a sale of 100% of the stock of the [c]ompany is the best means of maximizing value

---

[73] One case did not involve a sale, but rather a discovery dispute.  In *Brown v. Rosenberg*, 1981 WL 7638 (Del. Ch. Dec. 17, 1981), the Court of Chancery stated that "it is more likely than unlikely that a [c]ourt will end up appointing a receiver to liquidate a corporation where there are but two stockholders, both of whom own 50% of the corporation's shares, when they are unable to agree on anything." *Brown*, 1981 WL 7638, at *5.  This language, which has never been cited by another court, appears in *dictum* at the end of the court's order resolving a discovery dispute between the parties.  *Id.*

[74] 2002 WL 1402273 (Del. Ch. June 21, 2002).

[75] *Id.* at *5.

[76] For instance, the stockholders disagreed on whether the seller and the company's employees could be enjoined from competing with the corporation following the sale.  *Id.* at *6.

[77] *Id.*; *see also* Tr. of Oral Arg. at 3, *Fulk v. Wash. Serv. Assocs., Inc.*, No. 17747 (Del. Ch. June 4, 2001) ("[T]he parties are in agreement that this corporation needs to be dissolved.").

[78] *See Bentas v. Haseotes* (*Bentas I*), 1999 WL 1022112 (Del. Ch. Nov. 5, 1999); *Bentas v. Haseotes* (*Bentas II*), 769 A.2d 70 (Del. Ch. 2000); *Bentas v. Haseotes* (*Bentas III*), 2003 WL 1711856 (Del. Ch. Mar. 31, 2003).

[79] Order Appointing Custodian, *EB Trust v. Info. Mgmt. Servs., Inc.*, No. 9443 (Del. Ch. June 17, 2014) (ORDER).

for the benefit of the stockholders[.]"[80]   Similarly, in *In re Supreme Oil Company*,[81] "the parties agreed [in a Section 226 action] that a sale of 100% of the stock of the [c]ompany or the buy-out of [one of two competing stockholder groups], as the case may be, may be the best means of maximizing value for the benefit of the stockholders."[82]

Stockholder consent has a significant effect on the extent to which a remedy intrudes upon a corporation's business and affairs.  The existence of consent by stockholders to a sale alters the dynamic with respect to the Court of Chancery's exercise of its discretion in those cases.  Almost by definition, if there is consent, there is less "intrusion."[83]

Cases in which the Court of Chancery has appointed custodians for solvent corporations support a narrowly tailored, incremental approach to the custodian's power.  For example, in *Miller v. Miller*,[84] the Court of Chancery rejected a fifty-

---

[80] *Id.* at 2.

[81] 2015 WL 2455952 (Del. Ch. May 22, 2015) (ORDER).

[82] *Id.* at *1.

[83] *See Intrusion*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "intrusion" as "[a] person's entering without permission").  In *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993), this Court rejected the suggestion that there should be special, judicially-created rules to "protect" minority stockholders of closely-held Delaware corporations.  There, we commented that, "[i]t would do violence to normal corporate practice and our corporation law to fashion an *ad hoc* ruling which would result in a court-imposed stockholder buy-out for which the parties had not contracted."  *Nixon*, 626 A.2d at 1380.  Elting and Shawe could have, but failed to negotiate an exit strategy.  A sale of TransPerfect would give each stockholder a *pro rata* interest in the control premium to which they otherwise would not be entitled.

[84] 2009 WL 554920.

27

percent stockholder's attempt to secure appointment of a custodian to divide or liquidate a corporation, reasoning that "[t]he mere existence of an even stockholder split does not, by itself, authorize dissolution of the corporation or the sale of its only asset through the appointment of a custodian under 8 *Del. C.* § 226, at least without more."[85]  Instead, the custodian's "powers should be tailored as narrowly as possible because judicially-supervised interference with the ordinary operation of a corporation should be kept to a minimum."[86]  The court appointed a custodian for a two-year term to "break material deadlocks" between the two equal stockholders, "resolve operational deadlocks[,]" and "seek to resolve the impasse over the future of" the corporation.[87]  It explicitly instructed the custodian not to "sell or divide" the corporation's assets.[88]

The Court of Chancery's decisions in *Bentas*[89] illustrate the principle that the court should minimize its intrusion in the business of the corporation—and actually attempt (not merely consider and reject) less intrusive remedies.  There, four stockholder-directors, who owned the corporation in equal shares, were divided into two factions.  After one faction sought appointment of a custodian, the Court of Chancery initially declined to appoint a custodian, and instead ordered a

---

[85] *Id.* at *5 (citing 8 *Del. C.* § 226).

[86] *Id.* at *4.

[87] *Id.* at *5.

[88] *Id.* at *5 n.21.

[89] *See Bentas I*, 1999 WL 1022112; *Bentas II*, 769 A.2d 70; *Bentas III*, 2003 WL 1711856.

28

stockholders' meeting pursuant to Section 211 to determine whether the stockholders were deadlocked.[90] As a result of the meeting, two family directors were elected, and the remaining two family directors did not receive the requisite votes and became holdover directors.[91] The court thereafter appointed a custodian, reasoning that the circumstances, including the holdover directors' history of exercising "negative control" over the company by defeating quorum at board meetings,[92] implicated a "concern that [Section] 226(a)(1) is designed to remedy, namely, a stockholder deadlock that would 'permit control of the corporation to remain indefinitely in the hands of a self-perpetuating board of directors.'"[93]

As to the scope of the appointment, the defendants sought authorization for the custodian either to divide the company's assets into two corporations, "cause the corporation to purchase the plaintiffs' interest in the [c]ompany[,]" or, "failing either of the above described alternatives, sell the [c]ompany to a third party, structured either as an asset or stock sale."[94] The plaintiffs advocated a role in which the custodian would "investigate potential solutions to resolve the deadlock among the stockholders; to recommend such solutions to the stockholders; and in the event no proposal is acceptable to all of the stockholders, to recommend

---

[90] *Bentas I*, 1999 WL 1022112, at *1.

[91] *Bentas II*, 769 A.2d at 73.

[92] *Id.* at 78.

[93] *Id.* (quoting *Giuricich*, 449 A.2d at 239) (alterations omitted).

[94] *Id.* at 79.

29

liquidation of the [c]ompany to the [c]ourt."[95]  The court favored the plaintiffs'

approach and concluded that it was "more appropriate to empower the custodian to

explore any and all alternatives that might result in a mutually agreed solution to

the current shareholder deadlock."[96]

Three years later, the custodian filed a report "concluding that liquidation

was necessary and desirable, and recommending an auction of the [c]ompany's

assets as a single package or as a series of asset packages."[97]  The parties submitted

competing proposals, with each side arguing that "its proposal for liquidating the

[c]ompany is the best way to maximize stockholder value."[98]  The defendants

sought division of the company's operating assets into two corporations, with one

belonging to each of the two factions, but the custodian and the plaintiffs favored

an auction.[99]  "The [p]laintiffs prefer[red] to sell the entire [c]ompany as a means

of liquidation, but they also proposed a plan to partition the assets, since they knew

the defendants would oppose a sale."[100]  Because the parties did not desire a trial,

the court determined that "only an auction [would] provide reliable information"

---

[95] *Id.* at 80.  The plaintiffs also questioned whether Section 226 permitted the court to "direct the custodian to employ one or more of [the defendants' proposed] measures." *Id.* at 79.  The court did not explicitly agree or disagree with this statement, but observed generally that the plaintiffs "have the better position." *Id.* at 80.

[96] *Id.* at 80.

[97] *Bentas III*, 2003 WL 1711856, at *2.

[98] *Id.*

[99] *Id.*

[100] *Id.*

30

about the value of the company.[101]  The Court of Chancery ordered an auction "to resolve the issues posed by the two pending motions" and determine "whether a viable market for the [c]ompany (or any of its lines of business) exists, and whether a sale of the entire [c]ompany will generate bids that reflect the [c]ompany's intrinsic value."[102]  The court indicated that, should the auction "fail[] to attract any bidders . . . , the [c]ourt is free to decline to approve any sale, and to order a division of the assets according to the defendants' plan, or some other plan."[103]  Thus, although the court ordered an auction of a solvent corporation in *Bentas*, it did so by degrees, exhausting less intrusive remedies first.  Further, all stockholders agreed that liquidation was necessary and that the Company could not continue in its existing form.

The case law applying Section 226 therefore supports the view that the sale of the Company, absent stockholder consent, is too drastic a measure, and that the trial court should consider implementation of remedies on an incremental basis.[104]

---

[101] *Id.* at *4.

[102] *Id.*

[103] *Id.*

[104] The Majority suggests that "less-intrusive measures" or "intermediate measures were attempted but failed."  Majority Op. at 2, 13, 26.  This is perplexing.  A mediation and settlement efforts occurred, but no intermediate measures were "attempted and failed."

## III.

### In View of the Above, the Court of Chancery's Remedy Here Was, at a Minimum, Too Extreme and Was Not Authorized by the Statute

In deciding whether to exercise its discretion to appoint a custodian and, if so, for what purpose, the Court of Chancery believed it had three options.[105] *First*, it could deny Elting's request for a custodian altogether "and leave the parties to their own devices."[106] The court did not find this option viable, however, because it found that TransPerfect's management was in a state of "complete and utter dysfunction[,]" and "it would be unjust to leave Elting with no recourse except to sell her 50% interest in the Company."[107] In particular, the court remarked that Elting would have difficulty selling her shares for a "fair price" due to Shawe's actions.[108]

*Second,* the court recognized that it could "appoint a custodian to serve as a third director or some form of tie-breaking mechanism in the governance of the Company."[109] Such an appointment would complete the full board of directors as contemplated by TransPerfect's bylaws, which provide for three directors.[110] The

---

[105] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *31.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *See* By-Laws of TransPerfect Global, Inc. at Art. II, § 2(a), *available at* B2857-67.

32

court believed, however, that doing so "would enmesh an outsider and, by extension, the [c]ourt into matters of internal corporate governance for an extensive period of time."[111] Noting that Shawe and Elting are "relatively young" and could continue in their positions with TransPerfect "for decades[,]" the court felt that it was "not sensible for the [c]ourt to exercise essentially perpetual oversight over the internal affairs of the Company."[112]

*Third*, the court considered appointing a custodian to sell the company, an alternative that the court recognized was "unusual" but, in its view, not unprecedented.[113] However, as noted above, the cases relied on by the Chancellor in support of his decision were *Bentas*,[114] in which the court ordered a sale only as a last resort, and *Fulk*,[115] a Section 273 case in which the parties "had come to agree that the corporation needed to be dissolved."[116]

The Court of Chancery thus appointed a custodian who had previously

---

[111] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *31. The cases discussed above suggest that the Court of Chancery had involvement in them for extended periods of time.

[112] *Id.*

[113] *Id.* The Chancellor stated that the Court of Chancery "occasionally has appointed custodians to resolve deadlocks involving profitable corporations and authorized them to conduct a sale of the corporation." *Id.* (citing *Bentas II*, 769 A.2d at 73 n.3; *Bentas III*, 2003 WL 1711856; *Fulk*, 2002 WL 1402273, at *2).

[114] *Bentas II*, 769 A.2d at 73 n.3; *Bentas III*, 2003 WL 1711856.

[115] 2002 WL 1402273.

[116] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *31 n.320 (citation omitted). Notably, Section 273 is not applicable here as there are three owners.

33

served as mediator to the parties.[117] The court directed the custodian to "oversee a judicially ordered sale of the Company."[118] The accompanying Order demonstrates that any stockholder not purchasing the Company may be required to sell his or her shares.[119] The court also directed the custodian, "[i]n the interim," to "serve as a third director with the authority to vote on any matters on which Shawe and Elting cannot agree and which rise to the level that [the Custodian] deems to be significant to managing the Company's business and affairs."[120]

In my view, the Court of Chancery failed to narrowly tailor the scope of the custodian's authority, which contemplates the possibility that each stockholder be a seller. The court could have appointed a third director, as provided for in the company's bylaws, similar to the appointments made in *Miller* and *Bentas*. Although the Chancellor considered this option and appointed the custodian as an "interim" tiebreaker until the Modified Auction could be completed, he rejected this solution out of concern that the court would be involved in TransPerfect's

---

[117] *Id.* at *32.

[118] *Id.*

[119] *See In re TransPerfect Global, Inc.*, 2016 WL 3949840, at *2 (Del. Ch. July 18, 2016) (ORDER) (stating that the sale "may involve, without limitation, the sale of 100 percent of the Company's stock to a third party, or the sale of one or more of the stockholders' shares of stock in the Company to another stockholder and/or a third-party investor who has bid for such shares in conjunction with an existing stockholder").

[120] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *32 (citing *Bentas II*, 769 A.2d at 79).

affairs for too long.[121] The Chancellor did not consider the possibility of appointing a custodian for a period of time or expanding the Board to include independent directors.[122] If these less drastic remedies failed, the custodian could petition the court for more drastic relief as in *Bentas*. But absent consent, however, I do not believe a forced sale is a statutorily authorized option.

## IV.

In conclusion, my construction of Section 226 takes account of property rights and due process protections because I believe these concepts are embedded in the relevant statutory framework. This is evident in Section 159's express statement that stock is personal property, and in the other provisions of our statutory framework that provide clear and express notice in situations where defeasance of that property right might occur. That is why, in reading our statutory scheme harmoniously, it is compelling *not to imply* the power of the Court to issue an order that can result in defeasance of these rights over the objections of the owners. In cases where the stockholders do not object, then there is no such

---

[121] *Id.* at *31, 32. Mr. Shawe suggests on appeal that the Court of Chancery could have ordered amendment of the Company's bylaws "to expand the board by addition of independent directors" and that those directors could be delegated the responsibility of "elect[ing] successors and fill[ing] vacancies." Opening Br. of Philip R. Shawe at 22 n.8. He contends that he "proposed additional alternatives before and during litigation." *Id.* Mr. Shawe points to correspondence in which his lawyer made proposals on his behalf to counsel for Ms. Elting, including suggestions that Ms. Elting sell her stake in the company to a third party, offers for Mr. Shawe to purchase her shares, and a proposed shareholder agreement. *See* A3169-80; A3186-93; A3274-78; A3329-65.

[122] *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *32; *Miller*, 2009 WL 554920, at *5.

potential infringement and the court would not be so limited in fashioning a remedy that invokes a sale or transfer of their shares. This reading of Section 226 is consistent with the long-standing policy of strictly limiting the powers of court-appointed custodians.

The Majority Opinion now puts stockholders on notice, at least prospectively, that in deadlock situations where a custodian is appointed pursuant to Section 226, a sale to a third party over the objections of stockholders is a potential permissible outcome, even for a thriving business. This "judicially created notice" now accomplishes what is expressly stated in other provisions of the DGCL and other statutes where defeasance of property rights is possible. These stockholders, however, appear to be stuck with this unanticipated outcome.[123]

---

[123] Ms. Shawe, for example, suggests that her constitutional arguments were not raised prior to trial because of the unforeseeable nature of the Chancellor's unprecedented interpretation of Section 226. *See* Reply Br. of Shirley Shawe at 5.